# Exhibit B

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            .   Chapter 11
                                  .   Case No. 22-11068 (JTD)
FTX TRADING LTD., *et al.,*       .
                                  .   (Jointly Administered)
          Debtors.                .
. . . . . . . . . . . . . . . . . .
                                  .
FTX TRADING LTD., WEST            .
REALM SHIRES SERVICES, INC.,.
AND ALAMEDA RESEARCH LTD.,        .
                                  .
        Plaintiffs,               .
                                  .
          -against-               .   Adv. Pro. No. 23-50759 (JTD)
                                  .
MIRANA CORP., BYBIT FINTECH .
LTD., TIME RESEARCH LTD.,         .
SIN WEI "SEAN" TAN, WEI LIN .
"GERMAINE" TAN, WEIZHENG YE,.
AND NASHON LOO SHUN LIANG,        .
                                  .
        Defendants.               .
. . . . . . . . . . . . . . . . . .
                                  .
ALAMEDA RESEARCH LLC, FTX         .   Adv. Pro. No. 23-50419 (JTD)
TRADING LTD., WEST REALM          .
SHIRES, INC., AND WEST            .
REALM SHIRES SERVICES INC.        .
(D/B/A FTX.US),                   .
                                  .
        Plaintiffs,               .
                                  .
   v.                             .   Courtroom No. 5
                                  .   824 North Market Street
DANIEL FRIEDBERG,                 .   Wilmington, Delaware 19801
                                  .
        Defendant.                .   Wednesday, January 31, 2024
. . . . . . . . . . . . . . . . . .   10:30 a.m.


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

2

APPEARANCES:

For the Debtors:          Adam Landis, Esquire
                          LANDIS RATH & COBB LLP
                          919 Market Street
                          Suite 1800
                          Wilmington, Delaware 19801

                          Andrew Dietderich, Esquire
                          Brian Glueckstein, Esquire
                          Alexa Kranzley, Esquire
                          SULLIVAN & CROMWELL LLP
                          125 Broad Street
                          New York, New York 10004

For the U.S. Trustee:     Jonathan Lipshie, Esquire
                          Linda Richenderfer, Esquire
                          Benjamin Hackman, Esquire
                          OFFICE OF THE UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801

For the Official
Committee:                Kenneth Pasquale, Esquire
                          Kris Hansen, Esquire
                          PAUL HASTINGS LLP
                          200 Park Avenue
                          New York, New York 10166

For the Joint Official
Liquidators of FTX:       Brett Bakemeyer, Esquire
                          WHITE & CASE LLP
                          1221 6th Avenue
                          New York, New York 10020

(APPEARANCES CONTINUED)

Audio Operator:           Dana L. Moore, ECRO

Transcription Company:    Reliable
                          The Nemours Building
                          1007 N. Orange Street, Suite 110
                          Wilmington, Delaware 19801
                          Telephone: (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

APPEARANCES (CONTINUED):

For Aurus Tech LTD:          David Klauder, Esquire
                             BIELLI & KLAUDER, LLC
                             1204 North King Street
                             Wilmington, Delaware 19801

                             Thomas Bielli, Esquire
                             BIELLI & KLAUDER, LLC
                             1095 Spruce Street
                             Philadelphia, Pennsylvania 19103

For TMSI:                    Mark Minuti, Esquire
                             SAUL EWING LLP
                             1201 North Market Street
                             Suite 2300
                             Wilmington, Delaware 19801

For MAPS Vault:              Dennis O'Donnell, Esquire
                             DLA PIPER (US) LLP
                             1251 Avenue of the Americas
                             New York, New York 10020

For BOBA Foundation:         John Weiss, Esquire
                             PASHMAN STEIN WALDER HAYDEN P.C.
                             Court Plaza South, East Wing
                             21 Main Street
                             Suite 200
                             Hackensack, New Jersey 07601

For Steadview Capital:       Douglas Mintz, Esquire
                             SCHULTE ROTH & ZABEL
                             555 13th Street, NW
                             Suite 6W
                             Washington, DC 20004

For Foundation
Serendipity/Elements:        Kurt Gwynne, Esquire
                             REED SMITH LLP
                             1201 North Market Street
                             Suite 1500
                             Wilmington, Delaware 19801

For Michael Lusk:            Michael Lusk, Esquire
                             MICHAEL LUSK ATTORNEY AT LAW
                             1030 Noble Street
                             Anniston, Alabama

4

INDEX

BENCH RULING:                                                   PAGE

    JUDGE'S RULING ON IRS ESTIMATION MOTION                      7


MOTIONS:                                                        PAGE

Agenda
Item 24: Update Regarding Chapter 11 Cases                       17

Agenda
Item 25: Motion of Debtors to Estimate Claims                    34
         Based on Digital Assets
         [D.I. 5202; Filed 12/27/23]

         Court's Ruling:                                        128


EXAMINATIONS:                                                   PAGE

    EDWARD MOSLEY
    Cross-examination by Mr. Bielli                              39
    Cross-examination by Mr. Gwynne                              46
    Redirect examination by Mr. Glueckstein                      58

    KEVIN LU
    Direct examination by Mr. Glueckstein                        64

    SABRINA HOWELL
    Direct examination by Mr. Glueckstein                        69
    Cross-examination by Mr. Bielli                              73


DECLARATIONS:                                                   PAGE

1) Edward Mosley                                                 37

2) Sabrina Howell                                               72

(Proceedings commence at 10:34 a.m.)

(Call to Order of the Court)

THE COURT:  Good morning, everyone.  Thank you. Please be seated.

Before we begin, Mr. Landis, I want to lay out how we are going to proceed today.  First, I am going to give the ruling that I said I would give on the burden of proof issue for the IRS estimation hearing.  We will do that first and get that out of the way.

As for timing, today we will take a break for lunch at 12:10. I have an internal meeting I have to attend. We will take an hour lunch break and then we will come back. We will end at 5 p.m. today. I am assuming we will finish today, but if we don't I have tomorrow and Friday available so we can continue the hearing if we need to.

Today, for this hearing, we took a little bit different approach on access to the Zoom.  Under our new procedures parties and counsel have access to the live Zoom. They can see the proceedings on the Zoom call.  Those who are not participants normally would sign up and receive a telephone number to dial in.  In this case we have, and because we expected a large number of people interested, a YouTube channel and those who tried to sign up for the phone number received an email saying go to the YouTube channel.

During the course of the hearing, if we have --

and I am going to ask people who are on Zoom please keep your video off unless I call on you. For people on the Zoom, when witnesses are testifying under our new procedures established by the Judicial Council, they cannot continue to listen. So, they will be disconnected. I will make an announcement ahead of time. Apparently it takes a few minutes for that to happen.

So, when the witnesses are called, we will take a short five-minute recess to allow the YouTube channel to be turned off. Then once the witnesses are done, we will reestablish the YouTube channel and bring those people back in, then we will take another short break to allow that time to happen.

When signing up we had a large number of people who did not follow the procedures on the website that you sign up by 4 o'clock the day before the hearing. Close to 100, I think, signed up late. I am not going to allow that to happen in the future. If you don't sign up by 4 o'clock the day before you are not going to be able to participate. So, make sure you pay attention.

Then one other issue that I will get to after I do my reading of the bench ruling on the IRS issue, I am going to make a preliminary ruling in this matter based on the filings that were provided to the Court. I don't need oral argument on that issue, so I will let you know what that

issue is and that has to do with the time for when estimation is established, when to establish the value of a claim.  So, I will address that issue as well.

First, let's get to the bench ruling on the IRS issue.  The question before me today is which party should bear the burden of proof in the upcoming Section 502(c) estimation of the IRS's claim against the debtors.

As Judge Swain noted in her opinion, estimating the net revenue claim of certain bondholders in financial oversight and management board for Puerto Rico, 2023 Westlaw 4189779 at Page 7, Footnote 11, District Court for the District of Puerto Rico June 26th, 2023:

"It is not clear that the Court has to address evidentiary burden at all in the context of an estimation hearing where the predication of hypothetical outcomes is committed to the Court's discretion."

However, as Judge Swain did in her case, I will provide guidance to the parties on how the evidentiary hearing should proceed and allocate the burden of proof.

Following an acute onset of financial distress in November 2022 the debtors commenced this bankruptcy proceeding when they voluntarily filed for relief under Chapter 11 of the Bankruptcy Code.  By now it is widely known that, as debtors' counsel writes that: "The debtors prepetition management utterly failed to implement corporate

controls and left behind a complete absence of trustworthy financial information," that is D.I. 4204 at 6, "creating uncertainty as to the debtors' potential tax liabilities."

The IRS filed proofs of claim in April 2023 claiming approximately $44 billion in tax liabilities. From the outset the IRS noted that these values are estimates that consider information from the debtors' tax returns along with the fact that the debtors were actively engaged in fraudulent activity. As such, the amounts claimed by the IRS were designated to be adjusted as necessary. The IRS amended some of its claims in November 2023 to reduce the total to approximately $24 billion and more recently to $8 billion.

In response, the debtors filed a motion to establish a schedule and appropriate procedures for estimating the IRS claims pursuant to Section 502(c) of the Code. A hearing was conducted on December 13th, 2023, where I decided that estimation was appropriate under Section 502(c) because the IRS's claim was unliquidated.

At the hearing I requested additional briefing from each party specifically on the issue of which party bears the burden of proving or disproving the validity of the IRS's estimates. Further argument on the burden of proof issue was presented during the January 17th, 2024 status conference. The IRS argues that the burden of proof rests with the debtors because the IRS is entitled to a presumption

of correctness for all reasonable estimates it makes.  The debtors disagree, contending that the IRS bears the burden of proof because:

One, the presumption of correctness only applies to circumstances where the IRS has issued a formal deficiency assessment, which has not been done here and;

Two, because they believe that the estimated value of the claims qualify as arbitrary and excessive.

Because it is impossible for me to determine from the face of the IRS's proofs of claim the basis for its conclusion that the debtors owe an estimated $8 billion of taxes, I will require the IRS to first present its case setting forth the basis for its estimation.  The debtors will then have the opportunity to prevent evidence to contradict the IRS's position and the IRS shall have a chance to rebut the debtors' evidence.  For the reasons discussed below, the burden of proof at the estimation hearing will rest on the IRS.

At the outset it should be noted that bankruptcy judges are afforded substantial discretion in directing the estimation process.  That is Bittner v. Borne Chemical Company, 691 F.2d 134 at 135, Third Circuit 1982.  The bankruptcy code itself is "Silent as to the manner in which contingent or unliquidated claims are to be estimated."  The Courts have acknowledged that estimation is "At best an

imprecise and uncharted process." That is In Re Frascella Enterprises, Inc., 360 B.R. 435 at 458, Eastern District of Pennsylvania 2007.

This Court has maintained that "Bankruptcy courts may use whatever method is best suited to the case as long as the procedure is consistent with fundamental bankruptcy policies which require speed and efficiency." In Re Pacific Sunwear of California, Inc., 216 Westlaw 4250681 at Page 3, Bankruptcy District of Delaware August 8th, 2016.

However, there are a few generally accepted principals that govern the burden of proof to be used in estimation procedures. First, it has been widely noted that "The estimation process is merely a microcosm of the ordinary claims determination process." That is In Re FGR, Inc., 121 B.R. 451 at 456, Bankruptcy Eastern District of Pennsylvania 1990, and In Re Financial Oversight and Management Board, 2023 Westlaw 4189779 at 7.

Accordingly, the burden of proof should be the same in both claim estimation and a proceeding to determine the merits of the claim. Second, Courts frequently recognize that "Where non-bankruptcy law identifies the burden of proof, the ultimate burden of proof for a particular claim is determined consistent with that law." In Re Stone & Webster, Inc., 457 B.R. 588 at 608, Bankruptcy District of Delaware 2016.

Although Section 502 of the Bankruptcy Code and Bankruptcy 3001(f) establish a burden shifting scheme predicated upon the proper filing of a proof of claim courts recognize that "Bankruptcy does not alter the burden of proof imposed by applicable non-bankruptcy law." In Re Refco Public Commodity Pool, L.P., 554 B.R. 737 at 741, Bankruptcy District of Delaware 2016, citing Wiley v. Illinois Department of Revenue, 530 U.S. 15 at 21, 2000 Supreme Court case.

As both parties have pointed out, this idea traces back to Wiley v. Illinois Department of Revenue where the Supreme Court wrote: "Creditors entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation." In the context of claims litigation "The burden of proof is a substantive aspect of a claim," 530 U.S. 15 at 20 to 21.

Taken together these principals require "A bankruptcy court adjudicating a tax claim by the IRS to apply the burden of proof rubric normally applied under tax law." In Re Desert Capital REIT, Inc., 2014 Westlaw 3907972 at Page 11, Bankruptcy Appellate Ninth Circuit August 11th, 2014, quoting Nelson vs. United States, In Re Olshan, 356 F.3d 1078 at 1084, Ninth Circuit 2004.

While there are no clear examples of the allocation of the burden of proof between the government and

a taxpayer specifically setting up a bankruptcy claims estimation the law is clear that the burden falls on the IRS in this case: "In an action by the government for collection of taxes the burden of proof is upon the United States under the rule that the party that alleges must prove," Mertens Law of Federal Tax Income, 49E:54, 2023; Psaty v. United States, 442 F.3d 1154 at 1159, Third Circuit 1971.

The IRS meets its initial burden by introducing evidence of properly certified tax assessment.  The tax assessment is afforded a "presumption of correctness" which shifts the burden to the taxpayer to disprove the accuracy of the government's assessment.  The majority of tax collection cases includes such an assessment and so in the normal case the taxpayer usually has the burden of disproving the IRS's assessment; see In Re Anastasio v. CIR, 794 F.2d 884 at 886-88, Third Circuit 1986.

Because there has been no assessment here the IRS bears the burden of proven the accuracy of the figures contained in its proofs of claim.  In Re Brown, 169 B.R. 59 at 61, Southern District of Iowa 1994: "This Court believes that when taxes and penalties have not been assessed, the better rule is that the IRS bears the ultimate burden of proof."

Also, U.S. v. Kontaratos, 36 B.R. 924-931, District of Maine 1984: "The presumption of correctness is

accorded a proof of claim only because there has been a valid assessment."  The policy behind the presumption of correctness also supports this conclusion which maintains that the existence of the formal assessment itself implies "that the IRS commissioner who made the assessment has done so with sufficient evidence at his disposal."  In Re Fidelity American Financial Corp., 1990 Westlaw 299418 at 4, Bankruptcy Eastern District of Pennsylvania 1990.

Under this logic the IRS's estimates cannot be presumed correct as there is no indication that the values of its claims are supported by an equally sufficient basis as the values informal assessments.  The United States offers the Greco and In Re Fidelity cases for the proposition that "The presumption of correctness also applies to estimated tax liabilities."  That is D.I. 5410 at 4.

The Greco case isn't applicable here because in that case the Court examined the permissibility of estimated values within a formal tax assessment, 380 F. Supp. 2d 598 at 612, Middle District of Pennsylvania 2005.  While it is settled that the IRS may use estimations within its formal assessments, U.S. v. Fior D'Italia, Inc., 536 U.S. 238 at 245 (2002), there has been no formal assessment here.

I am also unpersuaded by the government's implication of In Fidelity for the notion that "Unassessed taxes presented in a proof of claim should be presumed

correct," D.I. 5410 at 4.  That case acknowledges one example of a Court treating a proof of claim as though it were an assessment but the Court ultimately refused to attach the presumption of correctness to the proof of claim precisely because "There had been no prepetition IRS tax assessment," 1990 Westlaw 299418 at 6, Bankruptcy Eastern District of Pennsylvania, February 8th, 1990.

For these reasons I disagree with the United States contention that all reasonable IRS estimates made without formal assessments are entitled to a presumption of correctness.  Claim estimation of bankruptcy is an imprecise process that is neither designed nor intended to yield exact numbers.  Nevertheless, I conclude that the IRS bears the burden of substantiating suggested estimation of the debtors' tax liabilities where there has been no formal assessment.

Any questions?

(No verbal response)

THE COURT:  One other issue before we get started. On the question of the estimation hearing for today I received a number of objections that the debtors selection of the petition date as the date for determining the value of the digital assets that are being estimated today is inappropriate because it's unfair; however, the code is very clear.  The code says that a claim is to be determined in U.S. dollars as of the petition date. I think that is Section

502(b).

Its no different in the context of a determination of the validity of a claim as it is for the estimation hearing under 502(c).  There are limited exceptions to this requirement, none of which are applicable here and, therefore, based on the filings that I received, and the objections that I reviewed, the debtors' position as well, I conclude that the debtors' use of the petition date as the date for determining the value of the digital asset claims is appropriate.  I have no wiggle room on that. The code says what it says and I am obligated to follow the code.

I understand those who have filed objections, mostly, I think all of them were pro se litigants, feel that this is unfair to them because of value of certain of the digital assets may have increased since the filing of the petition date.  The opposite is also true, some of the digital assets decreased in value since the petition date. Congress determined that we have to pick a date and they chose the petition date.  And, therefore, I am bound by that obligation under 502.

So, all objections to the timing of the date upon which the debtors chose to determine the estimated value of the claims are overruled on that basis; therefore, I don't need to hear argument on those issues.

Mr. Landis.

MR. LANDIS:  Thank you, Your Honor.  May I please the Court, Adam Landis from Landis Rath & Cobb on behalf of FTX Trading Ltd., and its affiliated debtors.

Your Honor just cleared out a number of opening comments I was going to make about the manner in which we proceed.

THE COURT:  Sorry for stealing your thunder.

MR. LANDIS:  No, not at all.  We thank you very much for the well-reasoned opinion and ruling with respect to the digital assets motion.

With that, Your Honor, we can go through the agenda relatively quickly.  Items 1 through 9 have been adjourned.  Item No. 10 was withdrawn.  Items 11 through 23 have been resolved with orders entered and the debtors are grateful for the Court's having reviewed those matters and entered many, many orders.

With respect to Item No. 24, the debtors have a status update that we would like to give and I would yield the podium to Mr. Dietderich for that.  I understand as well that counsel to the joint official liquidators in the Bahamas they want to give a status update in that case.  So, after Mr. Dietderich we would propose to have them give their update and then we would proceed with No. 25, the digital assets motion.

THE COURT:  Okay.  Thank you.

MR. LANDIS:  Thank you, Your Honor.

MR. DIETDERICH:  Thank you, Mr. Landis.

For the record Andy Dietderich, Sullivan & Cromwell.

May I please the Court, I have an update on the status of the case broadly this morning.  The financial situation of the debtors today is radically different then it was when the case began.  We remember what it was like in November 2022.  This was an emergency filing on no notice. It took us weeks to have even a first day hearing.  We started with no reliable digital asset security, no adequate books and records, no clear list of who worked at the company, no idea even who were the officers and directors of some of the applicable legal entities.  We had boards of entities that had never met.  There was a bank run on the exchanges and a bank run on Alameda.

In response assets have transferred to favored insiders at the last minute, entities and assets have been seized by regulators.  We had a pending insolvency in Australia and a pending insolvency in the Bahamas.  Two different black hat hacks had stolen hundreds of millions in cryptocurrency.  We had FBO customer accounts intermingled with operating accounts.  We had no reliable list of our banks or bank accounts.  We had billions of assets registered in the names of friends, romantic interests, relatives, and

employees.  We had a business record that was largely on signal a disappearing messaging app or in the head of Mr. Bankman-Fried.  And Mr. Bankman-Fried was not only in custody, but had declared "bleep the regulators, all I have to do is win a jurisdictional war with Delaware."

Its been a very long 15 months.  On behalf of Mr. Ray and the entire team I would like to say two things:

First, we recognize the profile that this case require scrutiny and we welcome it.  We will continue to be as transparent as our duties allow.

Second, the ongoing effort to provide recovery to victims here has been and continues to be some of the most rewarding work any of us will ever do as restructuring professionals.  It will be one for the history books.  And today we can now cautiously predict some measure of success.

Based on our results to date and current projections we anticipate filing a disclosure statement in February describing how customers and general unsecured creditors, customers and general unsecured creditors with allowed claims, will eventually be paid in full.  I would like the Court and stakeholders to understand this not as a guarantee, but as an objective.  There is still a great amount of work and risk between us and that result, but we believe the objective is within reach and we have a strategy to achieve it.

I would like to drill down on our assets, our liabilities, and the upcoming schedule.  First are assets.  We have had some disappointment.  We had very discouraging financial results to our initial M&A exercises.  Businesses FTX bought for hundreds of millions of dollars shortly before the petition time proved to have little substantial value and few interested buyers.

LedgerX was a horrible investment by FTX.  It was sold for only a fraction of its acquisition price.  Embed was worse and could not be sold at all.  A related disappointment is FTX 2.0.  We still have valuable customer data and information to monetize, but after an exhausted effort no investor has been ready to commit the needed capital to a restart of the offshore exchange, nor has a buyer emerged for that exchange as a going concern.

Why?  The exchange, as I said before, was not what it appeared to be.  It existed for only a few brief years and never required substance.  The costs and risks of creating a viable exchange from what Mr. Bankman-Fried left in the dumpster were simply too high.  So, our current Chapter 11 plan does not include the expectation of any recoveries from a restart of FTX.com.

We know there will always be true believers out there and if there still are they should call Perella and make a bid.  We know that for a time FTX played a function in

the cryptocurrency markets or, at least, pretended to.  If that function is to be replaced it will be by new operators with a new name and a better business plan and, hopefully, much better business practices.

We, as an estate, will continue to consider all options and are open to all options, but the plan of confirmation, the plan of reorganization and the confirmation process have to move forward now in order to give money back to victims.  That plan, as of today, does not currently include a reboot.  This will be important when Mr. Glueckstein rises later today to speak about the value of FTT and is reflected in the evidentiary record for the estimation motion.

Despite these setbacks we have also benefited from some even more significant positive developments.  The first, and perhaps the most important, is the runway created by the jurisdiction of this Court and the fact that substantially completely around the world our automatic stay has been respected.  The runway this created ended the bankruptcy and allowed us the time necessary to deliberately create a new balance sheet.  We would be nowhere without the time -- this time under the protection of the stay.

The second fact that we benefited from is the profile of the case.  We have been in front of you for litigation matters, of course, but not as frequently as could

have been necessary.  The main reason is that counterparties have been cooperative in settlement negotiations and we have secured hundreds of millions of dollars in voluntary turnover without ever filing public complaints.

A third main benefit to recoveries has been our relationship with governmental authorities. As I mentioned in the early days of the case, Your Honor, in the first months the board determined that spending estate resources to cooperate with governmental investigations was in the best interests of our debtors.  This was expensive given the extent of those government investigations and the sheer number of them, but it is proven to be the right call.

There has been no criminal indictment of any debtors (indiscernible).  Governmental entities have worked with us collaboratively all around the world to secure assets.  We hope to have a coordinated distribution scheme for the value that we control and over a billion dollars under the control of governmental authorities that avoids the massive duplication of expenses that was seen in cases like Madoff and other cases.  Finally, and critically, we continue to contemplate that over $9 billion of governmental claims for fines and penalties will be voluntarily subordinated to victims in our plan of reorganization.

The fourth main benefit has been the special nature of some of the relief granted by this Court. In

particular, the Court's advance approval of our digital asset sales.  This was novel relief, but --

THE COURT:  Could you give me access as well, please, so I can kick people off who don't follow my rules. Thank you.

MR. DIETDERICH:  Thank you, Your Honor.  The relief for digital assets in particular, Your Honor, was novel relief but incredibly valuable. The advance approval of our digital asset sales, rather then needing to bring individual transactions back to the Court has allowed us to liquidate our digital assets gradually based on day-to-day trading opportunities with the sophistication of a major trading operation.  It has been a resounding success.

A fifth main benefit is that we have to date avoided unnecessary litigation.  There have been negotiated understandings with government stakeholders including discussions underway with the CFTC and the SEC.  We have settled our customer adversary proceedings subject to confirmation of the plan.  We have settlements early with the JPL's in Australia and now happily with the JOL's in the Bahamas.

I am pleased to add to this list today of settlements, Your Honor, a settlement in principal that we reached only a few days ago with the founders of FTX EU who, as Your Honor knows, are litigation defendants and have filed

many motions.  All these matters, these EU matters, will be resolved by the settlement which is being documented and will be presented shortly with the Court for approval.

Finally, Your Honor, the last benefit is the incredible work done by Ernst & Young and the team on federal taxes.  Not surprisingly, FTX not only misappropriated funds from the exchange and went to the casino, but they lost money again, and again, and again.  Despite all the work done to maximize the recoverable value of assets and some individual success stories the portfolio remains a net loser.

Accordingly, we believe we have billions of dollars of lost carryforwards from previous bad investments and subject, of course, to the resolution of our disputes with the IRS, our plan does not currently expect that creditor recoveries will be materially reduced by federal taxes.

Taken together, the results of everyone's efforts are substantial recoveries; not what was lost, but substantial recoveries.  This hopefully puts to bed the alternative narrative that this business was just fine all along, it was not.  It was not a healthy business facing a bankrupt.  It did not have a mere liquidity crisis.  It was an irresponsible sham created by a convicted felon.

I would like to talk about claims.  If our asset recovery effort is on the verge of being a qualified success

the next equally immense challenge is claim management.  When I asked Mr. Coverick of A&M this morning to remind me the amount of claims filed by our bar dates he told me it was $23.6 quintillion.  I had to ask him how many zeros in quintillion and the answer is 18.  I then asked him to run recoveries if we allowed all of those claims and everyone would get a millionth of a percent.  So, we have a job to do.

As I said earlier, we currently anticipate that we will have sufficient funds to pay all allowed customer and creditor claims in full.  By "allowed," I mean claims of exchange customers and general unsecured creditors for their actual petition time losses, as calculated by the debtors.

And in order to have enough to pay these legitimate claims, several assumptions have to hold.  First, and most critically, our relationship with governmental stakeholders has to continue on its current path.  In particular, as I mentioned, we face over $9 billion of government claims that our plan contemplates will voluntarily support subordinate to the pecuniary losses of victims.  If this does not happen and we have to contest the merits of those governmental claims, recovery to customers and general creditors could decrease dramatically.

Second, we have to successfully contest the allowance of claims that we believe are not legitimate or, if legitimate, should be subordinated to the losses of customers

and general creditors.  There were several categories of these contested claims, some Mr. Glueckstein will address shortly.  Other material disputed claims include claims related to the OXY, MAPS, SRM, and other tokens, billions of dollars in general allegations of fraud, and other claims the debtors believe unsubstantiated, and, of course, the claims asserted by the IRS.

The frustrating fact is that we must hold over $10 billion in distributable value until both, a plan is confirmed and this claims-resolution process is well underway.  We're not a bank and we should not be holding this money any longer than is needed; it is not ours.

With respect to the first step, confirming a plan, we are on schedule to file the disclosure statement next month and proceed to a hearing and solicitation promptly, subject, of course, to any need to wait on the resolution of any other matters.  As I mentioned, we currently expect the disclosure statement to project that customers and creditors will eventually be paid in full.  I should say customers and general unsecured creditors in our defined class of general unsecured creditors will eventually be paid in full.

However, again, no one listening should hear that and think funds can come immediately.  In terms of making distributions, neither confirmation, nor effectiveness is the long pole in our tent.  The long pole is now the quintillion

dollars of asserted claims.  We cannot pay the legitimate creditors until we resolve these claims.

Customarily, as your knows, debtors have waited until after the plan is effective to begin claims reconciliation in earnest.  We're not waiting.  As the Court knows, we're not waiting.  Our hope is that we can not only have a plan become effective in 2024, but start making material distributions, as well.

We recognize in advance that this will place demands on the Court and we are sequencing matters to make sure that the most material claims resolution matters are first in the queue, such as the allowance of the dispute with the IRS and the next motion with Mr. Glueckstein today.

Thank you, Your Honor.

THE COURT:  Thank you.

Let me ask you while I have you up there, any update on the issuance of the mandate by the Third Circuit in the matter we talked about the other day?

MR. DIETDERICH:  Let me ask for it exactly.  Give me a moment.

(Counsel confers)

THE COURT:  Ms. Richenderfer might know, too.

MR. DIETDERICH:  Your Honor, we expect to be filing a consensual joint motion to the Third Circuit either today or tomorrow.

THE COURT:  All right.  Anything different?

MS. RICHENDERFER:  Thank you, Your Honor.  Linda Richenderfer, on behalf of the Office of the United States Trustee.

Yes, we received the other day -- I think it was yesterday, we received a draft motion from debtors' counsel and it has been, I think, circulated to all interest holders, including the Civil Appellate Division of DOJ, which represents the U.S. Trustee's Office in terms of the appeal.  And we have conceptually agreed to it.  I think it's being under review right now and I would anticipate it's going to be filed either today or tomorrow.

THE COURT:  Okay.  Great.  Thank you.

MS. RICHENDERFER:  We would hope, therefore, that the Third Circuit would react quickly to such an event.

THE COURT:  Okay.  Thank you.

MR. DIETDERICH:  Thank you, Your Honor.

Any other questions?

THE COURT:  Nope.  No other questions.  Thank you.

MR. DIETDERICH:  Okay.  Thank you.

I think I'll cede the podium to Mr. Shore for the -- or excuse me --

MS. BAKEMEYER:  Bakemeyer.

MR. DIETDERICH:  -- Bakemeyer -- I knew the name, just not the pronunciation --

MS. BAKEMEYER:  No, it's fine.

MR. DIETDERICH:  -- for the JOLs, thank you.

THE COURT:  Thank you.

MS. BAKEMEYER:  Good morning, Your Honor.  Brett Bakemeyer of White & Case on behalf of the Joint Official Liquidators of FTX Digital Markets Ltd.

First, we'd just like to thank Your Honor, chambers, and the debtors for giving us just a bit of time this morning on the calendar to provide the Court with an update with respect to FTX Digital's Chapter 15 case.  I know there were a few, small lo just call hurdles we had to get through, so thank you.

Second, I do want to mention that two of your JOLs are here today in the court, Mr. Brian Simms KC and Mr. Peter Greaves.  They've come to attend the estimation hearing, which has an effect on what we'll adopt in the Bahamas.

I'll be brief.  I would just like to speak to the global settlement agreement that was recently entered into and approved by Your Honor in the Bahamas court between FTX DM and the debtors.  I think it might be helpful to just make a few notes for any dot com customers listening and I'll just finish with some important dates and notes, with respect to the Bahamas liquidation proceeding if that's all right with Your Honor?

THE COURT:  Thank you.

MS. BAKEMEYER:  The GSA, the global settlement agreement itself represents a monumental effort of the parties to solve the bespoke and complicated cross-border issue that warranted many months that it took for us to get here.  As explained in prior hearings, the issue from the JOLs' perspective was always to define the scope of FTX DM's assets and liabilities.  That set up a conflict between the debtors and the JOLs regarding whose assets were whose.

After Your Honor's urging to resolve the issues, over the past six months, the JOLs and the debtors engaged in hundreds of hours of negotiations to come up with a solution.  The global settlement is structured around one key concept: that dot com customers have the same claim against both estates.  The solution embodied in the global settlement is that customers can now have their claim resolved by their choice of jurisdiction in a manner that will not prejudice them and allows both estates to run their individual processes in tandem.

More specifically, if any of the dot com customers with a deposit on the FTX.com platform -- not the U.S., just the international platform -- wish to have their claim adjudicated, treated, and paid out by the Bahamas, they may simply make an election on the debtors' ballots or submit a proof of debt in the Bahamas.  Once they make their election, they release the other estate from that underlying claim.

Then the estate that the customer elects will evaluate, adjudicate, and pay out that claim on, largely, the same parameters.  So, we'll be working hand-in-hand with the debtors and the plan administrator with respect to the claims adjudication process.

The dot com customers KYC procedures and preference offer, if any, will also not change depending on which estate they choose, and importantly, all dot com customers will get substantially the same percentage of recoveries on the substantially same timeline.

Now, I'd just like to note some important dates, with respect to the Bahamas liquidation proceedings for Your Honor.

THE COURT:  Okay.

MS. BAKEMEYER:  This past November on the anniversary of the appointment of the JOLs, the Bahamas Court sanctioned the winding-up order of FTX DM, placing it into full liquidation and appointing the JOLs as official liquidators.  On January 22nd, 2022, [sic], just last Monday, the JOLs had a hearing with the Bahamas Court and the global settlement was approved by the Bahamas Court with all ancillary (indiscernible).

Now that the global settlement has been Court-approved, FTX DM can officially launch its claims process.  As a first step, the JOLs will host a meeting for FTX DM's

creditors, including dot com customers, sometime before March 15th. Thereafter, customers can begin submitting claims or proofs of them.

On or about the first week of April, FTX DM will open up its claims portal online, allowing dot com customers and other claimants to submit their proofs of debt. The JOLs' claims portal will be substantially similar to the debtors', so dot com customers experiences should be seamless. The JOLs are working around the clock to get this portal up and running, with the assistance of the debtors.

Also, as Mr. Dietderich just mentioned, in the first week of April, the debtors are anticipating to send their ballots out, which provides that mechanism for dot com customers to elect into the Bahamas. The JOLs have set a bar date of May 15th, 2024, which is also currently the debtors' anticipated voting deadline on the plan. That's the proposed date in which those ballots must be submitted. These dates are intentionally matched up to help create a clean cutoff for the Bahamas election.

We don't anticipate needing the Chapter 15 Court for anything throughout this process, but we'll continue to keep the Court apprised of any material developments as we go along and we expect to have another status conference with respect to the Chapter 15 case right around the plan confirmation hearing.

And unless Your Honor has any questions, I'll cede the podium back over to the debtors.

THE COURT: Okay. Thank you, no questions. I appreciate the update.

MR. DIETDERICH: Your Honor, Andy Dietderich, again for the record.

I should just add, given the sequence here of the approval of the Bahamas settlement before the hearing, that from our side, this is also a significant event and to thank, on behalf of the debtors, the team for the JOLs, the three JOLs, and, you know, all of their advisors, including, of course, our colleagues at White & Case. The conversations, as you know, were very contentious early, but I think as soon as we came to the breakthrough idea that the customers, we could create an architecture where the customers would receive, effectively, the same recovery, regardless of where they put in claims, we were indifferent whether, you know, the claims were reconciled there or here, as long as there are safeguards to make sure that no one is using the Bahamas to recover more than they would recover in Chapter 11.

And once we had that central idea, the execution of that idea by JOLs and their team was consummately professional. They have been a pleasure to work with and it's nice to be on a first-name basis.

(Laughter)

MR. DIETDERICH:  So, thank you, Your Honor.

THE COURT:  Thank you.

MR. HANSEN:  Good morning, Your Honor.  Kris Hansen with Paul Hastings on behalf of the Official Committee.

Your Honor, just a brief note.  We want to say froth Committee's perspective, we appreciate the update, especially the effort and the contribution of all the core parties in advancing the cases to this point.  That includes the principals and professionals for all of the parties.

We want to point out for the Court that when the debtors, with respect to the update, it is the watershed moment for the debtors, obviously, to report that the disclosure statement will be filed in February, which will include, likely, payment in full of all customer claims and general unsecured creditors.  But as Your Honor held, that payment in full is based on the petition date values of those claims.

Many of those claims are premised upon currencies which declined dramatically in value in that tumultuous period leading up to the petition date, so many customers and creditors who are out there likely won't feel that that's a true payment in full from where they started, but we recognize that the petition date is the date that needs to be used.  As a result of that, Your Honor, all of the parties

are committed to continue to work together as we assess assets and liabilities to try to determine a way to continue to provide maximum recovery for all parties in interest.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Hansen.

MR. GLUECKSTEIN:  Good morning, Your Honor.  For the record, Brian Glueckstein, Sullivan & Cromwell, for the debtors.

With that, I think that brings us to the remaining agenda item on the today's calendar, which is the debtors' motion to statement claims based on digital assets.  Your Honor, just to kind of set the stage and if a few housekeeping points at the outset.  As reflected in the revised form of order that was filed this morning, and as noted in our reply papers that we filed on Sunday, the valuation component, assuming the estimation motion is approved and proceeds today, the valuation component on a small subset of four of the (indiscernible) tokens, MAPS, OXY, SRM, and BOBA, as well as certain related tokens, locked versions, and the like, as reflected in the schedule, are being deferred to a future evidentiary hearing that we expect to occur in consultation with chambers on March 20th, to allow for the completion of discovery on those particular digital assets.

The relief that we expect that that schedule, as

far as kind of a second evidentiary hearing on those discrete digital assets would be, you know, a single hearing for those assets that don't proceed to conclusion today, which, again, from the debtors' perspective are four. The remainder of the relief in the motion is we are proceeding with today, Your Honor, and we appreciate Your Honor's ruling at the outset and that certainly helps streamline the proceedings today.

We have been in discussions with numerous of the objectors and various parties and are pleased to report that the revised order that we filed this morning, by our understanding -- and I know some folks will want to be heard over the course of the day -- has fully resolved both, the informal comments we received from the United States Trustee's Office, as well as objections filed by Avalanche at 5685; the MDL plaintiffs at 5628; Three Arrows Capital, 5615; and Sunil Kavuri, and others who joined in that, at Docket 5232.

We have also, as I noted, adjourned the objection of the BOBA Foundation. Its BOBA token will go on the evidentiary track, as well as TMSI, who is contesting SRM-related issues. That litigation is proceeding -- that discovery process, with respect to those tokens has proceeded. The MAPS and OXY folks reached out to us very early on to make clear what was necessary. We've been working collaboratively to advance that process to that

hearing hopefully in March.

As far as today, Your Honor, unless the Court would like to proceed in a different manner, we would propose to address the evidentiary issues first and then proceed to argument of the motion, including, with respect to the various objections. The debtor has testimony in the form of declarations, primarily, which I'll get to in a moment, from three witnesses that we are offering in support of the relief requested today. Each witness has submitted written declarations as direct testimony, although, Your Honor, for our expert, subject to the Court's preference, we would like to briefly supplement those declarations with direct to qualify them and their reports.

So, subject to Your Honor's views, we would be prepared to proceed with the evidence.

THE COURT: Okay. Let's go ahead and proceed with the evidence.

MR. GLUECKSTEIN: Okay. Thank you, Your Honor.

THE COURT: With that, as I said at the outset, we need to take a short break so that we can disconnect the audio from the YouTube channel and then we'll -- so let's just take a very short, five-minute recess. Let's come back at -- it's 11:22 -- let's come back at 11:27. We'll come back.

MR. GLUECKSTEIN: Thank you, Your Honor.

(Recess taken at 11:22 a.m.)

(Proceedings resumed at 11:27 a.m.)

THE CLERK:  All rise.

THE COURT:  We're back, everybody.  Please be seated.

Mr. Glueckstein, do you want to call your first witness.

MR. GLUECKSTEIN:  Thank you, Your Honor.

Are you ready to proceed?

THE COURT:  Yes.

MR. GLUECKSTEIN:  Okay.  Thank you.

Again, Brian Glueckstein, Sullivan & Cromwell, for the debtors.  The first witness the debtors are presenting in support of the motion is Edward Mosley, a managing director at Alvarez & Marsal.  Mr. Mosley submitted a declaration at Docket 6728-3 and we would respectfully request that that declaration be admitted into evidence as his direct testimony.

Mr. Mosley is in the courtroom today, available for cross-examination.

THE COURT:  Is there any objection?

(No verbal response)

THE COURT:  It's admitted, without objection.

(Mosley Declaration received in evidence)

THE COURT:  Anyone wish to cross-examine

Mr. Mosley?

MR. BIELLI:  Good morning, Your Honor.  Thomas Bielli from Bielli & Klauder.  I'm not admitted in this court, but I was admitted *pro hac* last night.  My law partner David Klauder is present today.

Your Honor, we represent Aurus Tech, Ltd.  We filed an objection to the estimation motion.

Before we start, Your Honor, with the examination, I did want to briefly status on our objection.

THE COURT:  We're doing witnesses now.  Do you want to cross-examine the witness or not?

MR. BIELLI:  Yes, Your Honor.

THE COURT:  Okay.  Have the witness come forward.

Please take the stand and remaining standing for the oath.

THE CLERK:  Please raise your right hand.

Please state your full name and spell your last name for the record.

MR. MOSLEY:  Edward William Mosley II, M-o-s-l-e-y.

EDWARD W. MOSLEY, II, DEBTOR'S WITNESS, SWORN

THE WITNESS:  I will.

THE CLERK:  You may be seated.

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. BIELLI:

Q      Good morning, can you hear me okay?

A      I can.

Q      Thank you.

THE COURT:  Hold on.  Hold on.

Can you move closer to the microphone, Mr. Mosley.

Thank you.

BY MR. BIELLI:

Q      I'll try again.

Can you hear me okay?

A      I can.

Q      Okay.

MR. BIELLI:  Can Your Honor hear the witness okay?

THE COURT:  Yes, thank you.

MR. BIELLI:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes.

BY MR. BIELLI:

Q      What analysis have you conducted that the estimation process, without the estimation process, there would be undue delay on the bankruptcy cases?

A      The analysis by which I drew that conclusion, there's a bunch of different pieces.  First, the recovery analysis, that was built by Alvarez & Marsal under my direction and it is a fairly detailed model of all the assets and claims of

the debtors.  We make projections as to what we think the assets will be recovered by the date effective and then what will be remaining, and those are -- the other pieces are valued.  Then, the distributed proceeds to the allowed claims proceed down the waterfall, based on the absolute priority rule.  So that's one piece.

Another piece would be that the claims resolution analyses of all the claims filed and where we stand with those, those claims, what objections are yet to be made and what we think the claims will end up at.

And I guess the last piece, it's not truly analysis, but knowledge of the process of adjudicating those claims of how we would get there.

Q    Let's talk about that last part, how you would get there.

A    Okay.

Q    Was there an estimate on how long the claims adjudication process would take under a normal or ordinary procedure?

A    We've talked through what would need to happen for our plan, that includes the estimation motion.  If by "normal," you're talking, what if we do it without the estimation motion; is that what you're asking?

Q    Well, let's back up, then.

What would you say the normal claims objection process

would be?

A    In this case, with these facts and circumstances, I think this is the right way to adjudicate the claims.

Q    Are there other claims?

A    Sure.

Q    What are the other ways?

A    The debtor could, for the 87,000 claims, you know, go and try to adjudicate each one separately, instead of having one motion to have all of the values for each of the, we call them "tickers," you could just go one by one for each of those claims filed and go through a process, by which you say, the debtors object to your filed claim.  We do give them time to respond.  We go through a discovery process and we negotiate on whether or not we think we can come to some sort of resolution.  We have experts involved and we have, you know, (indiscernible) and motions to go put in front of the Court to adjudicate that claim.

Q    And is it your testimony that has to be done separately, claim by claim?

A    No, I want it to be done in the estimation motion.

Q    Are they the only two ways, claim by claim or estimation?

A    You could try to do it via omnibus, as well.

Q    Can you explain that to us, as well, please.

A    So an omnibus objection process is where we're going to

take claims by that we think have the same objection to a set of claims and object on that basis to say all of these claims, we object on this basis and put that in front of the Court.

Q    Have you done an analysis as to whether or not this debtor can do, as you mentioned, a separate claims objection for each claim or an omnibus process for the claims?

A    My team is still working through the 87,000 claims that have been put on file.  It takes a long time; you've got to look at each one.  And so, no, we do not have a feel for how long it would take or which buckets we would put each of these 87,000 claims into to bucket them up into various omnibus objections.  We are moving forward with the estimation motion.

Q    Okay.  I want to talk about, a little bit about the estimation methodology, okay?

A    Okay, other than -- I mean, obviously, I'm -- everything that's in my declaration makes sense, but if you're asking about things that aren't under my purview, like the valuation of each -- of each of the tokens, I can't speak to that.

Q    Okay.  Have you been involved -- in your scope in this case, have you begun any omnibus claim objection procedure?

A    Yes.

Q    And what steps have you taken?

A       So my team has first and foremost tried to take the filed claims and match them up with customer accounts.  If we can match up that claim with a customer account and, thus, you know, something that's on the schedules and in our books and records, then we can say, okay, this is what we thought the claim should have been, here's the variants, let's now try to put it into, you know, where are we different.  And then we have like a process to say, okay, what are the ways that we can object to this in an omnibus manner.  We only get three shots at each claim with omnibus, so you've got to be careful on how you do it.  You can't just like come up with an omnibus and file it, you've got to make sure that you can get everything you need done with that particular claim, done with three shots at it.

        With regard to everything else that we don't have a way of matching it up to a customer account, that has to be, you know, manually done where we're pulling it up and looking at the claim, trying to match it up with a customer, seeing where it came from, going through a discovery process, et cetera.  That's going to take time for those 87,000.

Q       When did you start that process for this debtor -- for these debtors?

A       Before the end of the bar date.  I mean, I don't remember exactly when our bar date was, but over the summer is kind of when we started.

Q      And when did you abandon that course of action?

A      It's not abandoned, we --

Q      Oh.

A      -- continue to reconcile all the claims.

Q      Okay.  So you'll be filing omnibus claims objections?

A      We will be filing omnibus claims objections.

Q      Okay.  Was -- when a claim objection -- when a proof of claim is filed with the Bankruptcy Court, it is deemed allowed, correct?

A      I'm -- I don't know.

Q      If you don't know, that's okay.

A      I don't know.

Q      Okay.  If a debtor files or if anybody else files an objection to a proof of claim that's filed, there would be a response, correct?

A      If the debtor files an objection, they don't have to respond, but, yes, they can respond.

Q      But they can respond, right?  A creditor would have the right to respond?

A      Correct.

Q      And how about discovery?  Did you mention that earlier in your testimony that there would be discovery after a claimant filed a response to a claim objection?

A      Yes, we can do discovery afterwards.

Q      And then you said there would be an evidentiary hearing

too, didn't you?

A      You can have an evidentiary hearing, yes.

Q      Are the claimants given that opportunity here if the estimation motion is granted?

A      Not -- well, I mean, first of all --

MR. BIELLI:  Thank you, Your Honor.  I don't have any other questions.

THE COURT:  He didn't answer the question.

You can answer, Mr. Moseley.

THE WITNESS:  So not for -- not for the pieces that we are saying are in the estimation motion, so the value of each token.  We're going to have evidentiary hearings on, you know, how many tokens that they have, if we have a disagreement on that.  The estimation motion is for the valuation of the particular token.

MR. BIELLI:  I don't have any other questions at this time, Your Honor.  If there's going to be, I guess, I don't know if it would be redirect, perhaps I'd like the opportunity to recross, but I don't think so.

THE COURT:  I don't allow recross.

MR. BIELLI:  Thank you, Judge.

THE COURT:  Anyone else wish to cross?

MR. GWYNNE:  Good morning, Your Honor, Kurt Gwynne from Reed Smith on behalf of the Foundation Serendipity and Foundation Elements creditors.

CROSS-EXAMINATION

BY MR. GWYNNE:

Q     Good morning, Mr. Moseley.

A     Good morning.

Q     In paragraph 2 of your declaration, you describe some industries in which you have experience; do you recall that?

A     It would be better if I had the declaration in front of me.

Q     You don't have a copy of it with you?

A     No.

        MR. GLUECKSTEIN:  Your Honor, may I provide the witness a copy?

        THE COURT:  Yes.

        MR. GLUECKSTEIN:  Does Your Honor need a copy?

        THE COURT:  No.  Thank you.

        THE WITNESS:  Thanks.  I'm there, sir.

BY MR. GWYNNE:

Q     Do you see in paragraph 2 where it lists a number of different industries in which you tout your 20 years of restructuring and distressed investment experience?

A     Yes, sir.

Q     Is the cryptocurrency industry one of those industries in which you have restructuring -- you list that you have restructuring and distressed debt experience?

A     Not before this case.

Q     Okay.  Can you please take a look at paragraph 3 of your declaration?

A     I'm there.

Q     Do you see where you talk in paragraph 3 about the Chapter 11 restructurings in which you have been involved?

A     This is some of the list, but, yes, I see it.

Q     Are any of those cryptocurrency cases?

A     As I stated before, I have not been involved in a crypto case before this one.

Q     Now, you believe that scheduled or filed proofs of claim that were asserted in crypto quantities need to be estimated so they can be converted to U.S. dollars, correct?

A     Correct.  I think that's what the -- you know, the general -- I don't think that's what my declaration says exactly, to be honest.

Q     Okay.

A     My declaration says I think we need to dollarize the claims.

Q     All right.  Well, do you need to dollarize scheduled claims?

A     Correct.

Q     And do you need to dollarize proofs of claim?

A     We want to dollarize all of the filed claims, yes.

Q     Now, the debtors have, you say, over two million in scheduled claims, right?

A      Correct.

Q      Who scheduled the debtors' claims?

A      The debtors.  So, myself, my team, in concert with the management team, as well as, you know, other professionals in the case.

Q      And the debtors and you and your team scheduled the customers' claims in crypto quantities, right?

A      Correct.

Q      You didn't schedule the claims in U.S. dollars, right?

A      No, we scheduled them in quantities with the estimation motion process in mind.

Q      Okay.  And that was the debtors' choice whether to file the scheduled claims in quantities or U.S. dollar values, right?

A      Yes, it was our choice.

Q      Did you ever suggest to the debtor that it simply schedule the claims in U.S. dollars amounts?

A      The price of the tokens, we didn't feel like we had a reliable source in the AWS system.  Obviously, the exchange had a price for every item on the exchange, but, you know, as with everything else with the IT at FTX, we didn't trust it, you know, we were using -- we were looking at other sources. And so we didn't feel comfortable taking a stance at that time on exactly what the value of each token would be as of the petition time.

Q      So you didn't suggest that the debtor value the claims in its schedules in U.S. dollar amounts; is that correct?

A      I'm not a valuation expert and when I didn't feel like we had a good, you know, reliable source for the price of each token because they're all complicated and different, we didn't feel like we could put that on the schedules.

Q      Okay.  Let's talk about the filed proofs of claim.  You say the debtor has approximately 87,000 filed proofs of claim, right?

A      Yes, sir.

Q      And isn't it true that the debtor asked the customers to file those proofs of claim in crypto quantities, not U.S. dollar amounts?

A      There are -- we asked them to respond to our crypto quantity amounts.  There's a portion of the proof of claim form where they could fill in whatever they want, and they did.

Q      And you're entitled to explain your answer, but can you answer yes or no to whether or not the debtor requested all of its customers to file the proofs of claim in quantities, crypto quantities, not U.S. dollar amounts?

A      We did ask them to do that, yes, but as I said before, the proof of claim form is the debtors interacting with the customers and on that sheet we asked them to fill in anything else that they -- that isn't in our table, and that's where

they have their opportunity and if they -- some of them put in dollars into that.

Q    So the debtor, who decided to file its schedules in crypto quantities and to ask creditors to file their proofs of claim in crypto quantities, is now complaining that it has too many claims in crypto quantities and therefore needs to estimate them, correct?

A    The debtor is asking to estimate all of the claims, scheduled and filed.  Does that answer your question?

Q    Well, you agree then, I was correct in what I said, right?

A    Please ask it again.

THE COURT:  He's asking you to explain your question, he didn't understand it.

BY MR. GWYNNE:

Q    Did you understand my question?

A    Please ask it again.

Q    The debtor -- the debtors, who chose to schedule claims in cryptocurrency quantities, not dollars, and who asked its creditors to file proofs of claim in crypto quantities, not U.S. dollars, is now saying, Your Honor, we have too many crypto quantity claims, we can't possibly litigate all of them to a dollar value, right?

A    I disagree with how you said that.  We asked for cryptocurrency amounts for each token and we want that.  We

need to know how much of each token they think they had as of the petition date, and that's a valid data point, we need that to do our process.

In addition, though, to dollarize the claims, I have to turn those cryptocurrency token amounts, quantity amounts, into a dollar amount via a market price as of the petition time, and that's what we're doing here with the estimation motion.

Q    And a creditor also can dollarize its claim, as you indicated, by completing that portion of the proof of claim, right?

A    Some of the creditors put in different tokens -- or the same tokens and a price, and, you know, the math that spit out.  Some of it was with errors, but, you know, some of the people put in what they thought the price should be in there.

Q    Are you aware that the Foundation Serendipity and Foundation Elements' proofs of claim total approximately $300 million?

A    I don't -- I didn't memorize all the proofs of claim, sorry.  No, I don't know that.

Q    Do you know -- did you hear debtors' counsel tell the Court, I believe he used the phrase a small subset of digital currencies aren't being valued today?

A    I heard him say that, yes.

Q    And did you hear him include the OXY -- do you remember

the tokens he said that were not being valued today, one was OXY --

A    I'm fairly certain it was MAPS, OXY, BOBA, and I think Serum, but I don't remember the last one.

Q    And do you know what percentage of the outstanding unsecured claims are represented by the OXY and MAPS creditors?

A    I'm sure I could -- I'm sure I have that in files somewhere, but I do not have it committed to memory.  As I said, there's two million claims, 87,000 filed claims, I don't have them committed to memory.  I'm sorry.

Q    Did you hear debtors' counsel tell the Court that the debtors have $26 quintillion in claims filed against them?

A    I think that number is a little off, but 20 -- over 20 quintillion, yes.

Q    And is it fair to say that the claims of creditors that hold OXY and MAPS tokens are a very small portion of that 20-plus quintillion dollars in claims?

A    Tell me what your threshold for small is.  I mean, it's very objective what you're asking and I've told you a couple times that I don't remember.  I didn't commit them to memory, I don't know what the -- to do that math, I'd have to know what their amount is and divide it by 20 quintillion, which is a big number.

Q    Okay.  Well, I'll give you a -- you asked me for a

threshold of what I would call a small amount.  Is it less than one percent?

A    It is going to be less than one percent, yes.

Q    Is it less than a half of a percent?

A    I don't have that math.  I'm sorry.

Q    It's common for debtors to put a range of potential recoveries in a disclosure statement, right?

A    It is common, yes.

Q    And it's also common for debtors to object to claims post-confirmation, right?

A    Correct.  The claims resolution process continues -- continues on normally at post-effective date.

Q    And it's also common for a debtor to establish a disputed claims reserve at confirmation to actually litigate claims post-confirmation, right?

A    It's common to do that, but I will tell you that it is difficult to do that when the number of -- the number and amount of the claims in question is as large as we're talking about.

Q    Well, you concede here that the debtor will have a reserve to deal with disputed claims, right?

A    I believe the debtor will have some sort of reserve for disputed claims.  We're going to do our best to try to get through as many of them, but there will probably be some that follow post-emergence.

Q    Okay.  And is it fair to say that you believe that it's important to dollarize the cryptocurrency claims so that it will most accurately reflect claims amounts and estimated recoveries in the disclosure statement?

A    Can you please ask that question again?

Q    Do you believe it's important to dollarize the value of the digital asset claims so that the disclosure statement accurately reflects claims amounts and estimated recoveries?

A    In my opinion, it's essential.  I can't do the recovery amounts without having some sort of value for the claims, you know, the math, I need that denominator.

Q    And you also believe it's important to permit creditors to make an informed decision when voting on the plan, right?

A    Indeed.

Q    And if there was a claim or right, for example, that somebody was asserting that could take all the assets away, all the digital assets away, you would want to have that resolved before the disclosure statement hearing, right?

A    That's a hypothetical, there's a bunch of facts and circumstances associated with it.  I mean, there's always going to be claims that are big and, you know, you need to know the facts and circumstances of that case to say whether or not it has to be taken care of before you can feel comfortable with your range.

Q    So you're saying it's possible that you could have a

claim to the debtors' assets that could take them all out of the estate where creditors would get nothing under a plan, but there are some circumstances where you wouldn't have to address that in the disclosure statement, you wouldn't have to have that claim resolved before the disclosure statement is sent out?

A     Once again, that's a hypothetical, but I'm sure that I could get comfortable with certain claims.  You know, if there was no merit to them, if I knew they were duplicative, right, I could get comfortable with that, but I'd need to know the facts and circumstances of the hypothetical before I could tell you with certainty whether or not we're comfortable saying that it has to be done pre-emergence or not.

Q     Have you ever read the service guidelines for the debtors' -- FTX's crypto exchange?

A     The service guidelines?

Q     Yeah, the rules of -- that are on the website for customers?

A     The terms of service?

Q     Yes.

A     I've read most of it in the context of other parts of what we're doing, but clearly that's not in my declaration.

           MR. GLUECKSTEIN:  Your Honor, I'm going to object to this.  We're now going way beyond the scope of the direct

and we are now into the terms of service, which they are not at issue for today's hearing.

MR. GWYNNE:  Your Honor, the witness testified in his declaration about undue delay.  He also testified about needing certain information to have in the disclosure statement for people to make an informed choice.  And one of the things I'm going to ask him about those terms of service is the fact that they say the customers own the assets and that there's a customer claim to those assets, and whether he thinks that's something that should be in the disclosure statement.  So I think it's well within the scope of his testimony.

THE COURT:  Limit it to that particular issue.

You can answer the question.

MR. GWYNNE:  I'll just re-ask it just in case --

THE WITNESS:  Okay.

BY MR. GWYNNE:

Q     You say you've read the terms of service for customers of FTX's crypto exchange, right?

A     I've read part of them, yes.

Q     Did you read the part of it that says the customers actually own the assets in their accounts?

A     I've read parts of it in which folks have, you know, pointed to as this is the reason why, you know, they think they have ownership of it or not, but I'm not a lawyer.  I

don't make a determination on whether or not I think that's valid or what it says or -- you know, I've read it from a businessperson's perspective.

Q    And so you're aware that customers are relying on that language to assert that they own the digital assets in their accounts, right?

A    I haven't talked with any customers, so I don't know what they're relying on.

Q    Do you think that's an important thing to know as the debtors' financial adviser who's testifying regarding the debtors' disclosure statement?

A    I know what the Code says and the process around the claims adjudication, you know, not often do I read a terms of service with customers and make a determination without counsel on whether or not, you know, they have a claim.

Q    Well, and not often have you been involved in a cryptocurrency case either, right?

A    I've never been involved in a cryptocurrency case before this.

        MR. GWYNNE:  I have nothing further, Your Honor. Thank you.

        THE COURT:  Thank you.

        Any other cross?

    (No verbal response)

        THE COURT:  Redirect?

MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian Glueckstein for the debtors, just briefly.

REDIRECT EXAMINATION

BY MR. GLUECKSTEIN:

Q    Mr. Moseley, could you just turn to your declaration? Do you still have that in front of you?

A    Yep.

Q    I just want to make sure the record is clear. Paragraph 6 of your declaration, you state in there that the debtors have over two million scheduled claims and 87,000 filed claims that include at least a single digit of assets. Do you see that?

A    Yes, sir.

Q    You go on to say that the claims are scheduled and filed almost exclusively in quantities.  Do you see that?

A    Yes, sir.

Q    So, Mr. Moseley, in order to have the information that you need and that customers need to understand the value of their claim, what needs to happen?

A    I need to be able to multiply the number of tokens for each of these tokens by a price in dollars and, to do that, I need a price, I need a price for each token in dollars.

Q    Okay.  And with respect to the SPA tokens, with respect to tokens in particular cryptocurrencies, do the debtors have a price that you could have provided in the schedules that

you believed was reliable or accurate?

A    Say that again?

Q    Did the debtors at the petition date a price with respect to SPA tokens that you could have put into the schedules and dollarize the claims yourselves?

A    We didn't feel comfortable using the price that was on the exchange server as the price for that token.  You know, we felt that we needed to say what is the market price to sell this token somewhere else, what would that price be, and for that -- we didn't have that handy at the time.

Q    There were some questions, Mr. Moseley, about the process in a claims objection process, as opposed to estimation; do you recall that?

A    Yep.

Q    There was questions about whether there would be discovery and an evidentiary hearing; do you recall that?

A    Yes.

Q    In your experience, do individual claims objections, that discovery and evidentiary process take time?

A    They do.

Q    Do you have a sense -- do those get resolved, generally, in a week?

A    Based on my experience, it's, you know, two to three months, right, to go through the full process of doing -- having the objection on file, giving the claimant time to

respond, having some negotiation, doing discovery, picking experts, putting those reports on, you know, doing depositions, et cetera, and then going back to court.

Q    Have you seen claims objections take longer periods of time, in your experience?

A    For sure.

Q    There was a question about whether there would be an evidentiary hearing with respect to the estimation motion; do you recall that?

A    I do.

Q    Is it your understanding that we're having an evidentiary hearing today?

A    I thought my testimony was evidence.  So, yes, I thought we were doing it, but maybe I've got the terminology wrong.

MR. GLUECKSTEIN:  Thank you, Your Honor.  No further questions.

THE COURT:  Thank you.  Thank you, Mr. Moseley. You may step down.

All right, we're at 12:02.  It doesn't make sense to call another witness for just a few minutes.  So why don't we take our break a little bit earlier and we'll come back at 1 o'clock, and we'll reconvene and we'll go from there.

Let me just get an understanding, we have two more -- are you calling both of your experts for supplemental --

MR. GLUECKSTEIN:  I am, Your Honor, but very briefly, only five to ten minutes for each.

THE COURT:  All right.  And do the parties who have cross, do you intend to cross-examine the expert witnesses as well?  Mr. Gwynne, Mr. Bielli?

MR. GWYNNE:  I'm sorry, Your Honor?

THE COURT:  Do you both intend to cross-examine both of the expert witnesses that the debtors are calling?

MR. GWYNNE:  Kurt Gwynne, for the record, Your Honor.  I do not intend to cross-examine those witnesses because we agreed that the valuation of our clients' claims, if it's going to be estimated, will be -- is not being handled today.  We're part of the small subset of claims that aren't being valued today.

The reason I cross-examined the first witness is because the issue that we are litigating today is whether or not estimation of our clients' claims is appropriate or whether we should have a regular claims allowance proceeding.  So that's why we crossed that witness and will not be crossing the other two.

THE COURT:  All right.

MR. GWYNNE:  Thank you, Your Honor.

MR. O'DONNELL:  Your Honor, Dennis O'Donnell, DLA Piper, on behalf of MAPS Vault.  We're similarly aligned.  We have reached an agreement with the debtors that those

witnesses, to the extent they affect that future valuation hearing, we'll come in today for what's on the calendar today, not what's going to happen in March. So we will not be cross-examining.

THE COURT: All right. Thank you.

MR. MINUTI: Good afternoon, Your Honor, Mark Minuti from Saul Ewing. Your Honor, I represent TMSI. The token that my clients are concerned with is Serum and, consistent with Mr. Gwynne's statements, those issues are not going to be decided today. So we're going to reserve our rights on cross when we have the further evidentiary hearing with respect to that token.

THE COURT: All right. Thank you.

MR. MINUTI: Thank you.

MR. KLAUDER: Good afternoon, Your Honor, David Klauder with Mr. Bielli on behalf of Aurus. I think we'll have cross with respect to one of the experts, I believe it's Dr. Howell.

THE COURT: Okay.

MR. KLAUDER: So we'll work over the lunch break to try to make that focused.

THE COURT: All right. Great, thank you.

MR. KLAUDER: Thank you.

THE COURT: All right, then we are recessed until 1:00 p.m. Thank you -- oh, one more? Sorry.

MR. WEISS:  Sorry, Your Honor, John Weiss on behalf of BOBA Foundation, essentially just to reserve rights as well.  We were put over to the hearing that will be held in March, I believe, with respect to the estimation issues.

THE COURT:  All right.  Thank you.

MR. WEISS:  Thank you, Your Honor.

THE COURT:  Anyone else?

(No verbal response)

THE COURT:  All right, thank you.  We're in recess until 1:00.  I'll see everybody then.

(Recess taken at 12:05 p.m.)

(Proceedings resumed at 1:02 p.m.)

THE COURT:  Let's go.

MR. GLUCKSTEIN:  Okay.  Thank you.  Again, Brian Gluckstein for the debtors.  The next witness that the debtors are calling is Kevin Lu, who's the director of data science and product at Coin Metrics, Inc.  Mr. Lu submitted a declaration containing his price analysis at Docket Number 5204.

Before requesting his declaration be admitted into evidence, we would like to call Mr. Lu briefly to the stand to provide some foundation for the Court.

THE COURT:  All right.  Thank you.  Mr. Lu, please come forward.  Take the stand and remain standing for the oath.

THE CLERK:  Please raise your right hand.  Please state your full name and spell your last name for the record.

THE WITNESS:  Kevin Lu.  Last name is L-U.

THE CLERK:  Do you affirm you will tell the truth, the whole truth, and nothing but the truth to the best of your knowledge and ability?

THE WITNESS:  Yes, I do.

THE CLERK:  You may be seated.

THE WITNESS:  Thank you.

MR. GLUCKSTEIN:  Your Honor, may I first the witness with a copy of his declaration?

THE COURT:  Sure.

MR. GLUCKSTEIN:  Does Your Honor need one?

THE COURT:  I have it.  Thank you.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MR. GLUCKSTEIN:

Q.    Good afternoon, Mr. Lu.

A.    Good afternoon.

Q.    Mr. Lu, can you please describe for the Court where you're currently employed?

A.    I'm currently employed at Coin Metrics.

Q.    And what is your role at Coin Metrics?

A.    I'm a director of data science and product.

Q.    What formal education degrees do you hold?

A.    I studied at the University of California, where I received -- Berkeley -- where I received a bachelor's in business administration and a bachelor's in economics with distinction.

Q.    Did you have professional experience in data sciences prior to joining Coin Metrics?

A.    Yes.  My professional experience consists of about 15 years at various companies, all of which involved applications of data science to financial data, including data sets that relate to prices for financial assets.

Q.    Mr. Lu, when did you join Coin Metrics?

A.    I joined five years ago.

Q.    Could you briefly explain for the Court what Coin Metrics is and what it does?

A.    Sure.  Coin Metrics is a data provider of cryptocurrency-related data.  We have several product offerings that range from market data, network or blockchain-related data, indexes, and risk products.  And our clients are financial institutions and companies engaged in the digital assets space.

Q.    Mr. Lu, what do you do in your role at Coin Metrics as director of data science?

A.    I have a range of responsibilities.  I oversee many product lines, but one of the product lines I oversee is the Coin Metrics prices.  This is one of our commercial data

offerings, and it represents prices that we calculate for a wide range of cryptocurrency and digital assets at various frequencies using various methodologies, and they're used by our clients for a wide range of purposes.

Q.   What role did you personally have in the development of the Coin Metrics prices?

A.   As I said, I joined five years ago when the company was founded.  This was when the company was pre-revenue and didn't have any commercial product offerings.  I played a key role in developing the Coin Metrics prices and bringing it from inception to a successful commercial offering today.  I was the principal author and designer of its methodology, and on a day-to-day basis, I oversee its performance and evaluate its performance during times of market stress, volatile price movements, and other situations.

Q.   Mr. Lu, what were you asked to do when you were retained by the debtors in these Chapter 11 cases?

A.   The scope of my assignment was to calculate prices for certain digital assets that were listed on the FTX exchanges, as well as to calculate a confidence interval reflecting the uncertainty of my determination of the price. I was also tasked with writing a declaration that would contain my qualifications and the methodology that I used.

Q.   And did you, in fact, prepare a declaration

detailing your pricing and methodology?

A.    Yes, I did.

Q.    And can you summarize at a high level, just very high level, what you did to provide the pricing set that's set forth in that declaration?

A.    I leveraged the data and methodology that are used in the Coin Metrics prices and applied that to calculate the prices of the assets within the scope of my work.  At a very high level, my methodology consists of two components.  One is to select a set of high quality constituent markets as input in the calculation of the price of an asset.

And the second component is the application of statistical methods to actually calculate the price and the confidence interval.  I applied these steps to the 428 assets within the scope of my work.

Q.    Mr. Lu, do you have a copy of your declaration in front of you?

A.    Yes.

Q.    Is this the declaration that you prepared for submission to the Court in this case?

A.    Yes, it is.

Q.    Okay.  And is that declaration an accurate reflection of the Coin Metrics pricing that was provided to the debtors here?

A.    Yes, it is.

MR. GLUCKSTEIN:  Your Honor, at this time, I'd like to move Mr. Lu's declaration, Docket 5204, into evidence in support of the motion.

THE COURT:  Any objection?  Submitted without objection.

MR. GLUCKSTEIN:  No further questions, Your Honor.  He's available for cross, obviously.

THE COURT:  I believe I asked before we broke for lunch if anyone was going to cross.  I don't think anybody was going to cross Mr. Lu is that correct?  Thank you.

Mr. Lu, thank you.  You may step down.

MR. GLUCKSTEIN:  Okay.  Then moving right along, Your Honor, our third and final witness on behalf of the debtors is Sabrina T. Howell, who's the Associate Professor of Finance at the NYU Stern School of Business.  Dr. Howell submitted a declaration that attached an expert report at Docket Number 5203, as well as a supplemental written declaration filed at Docket 67284.

And similarly, before requesting her declarations be admitted, we would like to call Dr. Howell to the stand to provide some foundation to the Court.

THE COURT:  Dr. Howell, please come forward, take the stand, and remain standing for the oath.

THE CLERK:  Please raise your right hand.  Please state your full name and spell your last name for the record.

THE WITNESS:  Sabrina T. Howell, H-O-W-E-L-L.

THE CLERK:  Do you affirm that you will tell the truth, the whole truth, and nothing but the truth to the best of your knowledge and ability?

THE WITNESS:  I do.

THE CLERK:  You may be seated.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MR. GLUCKSTEIN:

Q.   Good afternoon.  Professor Howell, could you please describe to the Court where you are currently employed.

A.   The NYU Stern School of Business.

Q.   And what is the focus of your work at the NYU Stern School?

A.   My research and teaching focus on Fintech, entrepreneurial finance, and innovation, among other topics.

Q.   What formal educational degrees do you hold?

A.   I have a BA in economics and East Asian studies from Yale University, a master's in economics from Harvard University, and a Ph.D. in the economics track of the political economy and government program at Harvard University.

Q.   Do you have any professional experience in the areas of economics and finance outside of your role as a

professor at the Stern School?

A.   I worked for two years as an economic consultant at Charles River Associates.

Q.   Professor Howell, do you have experience in your teaching and academic writings with valuation and digital asset related issues?

A.   I do.  I designed and teach a course at Stern on Fintech-focused entrepreneurial finance, where we value blockchain-related digital assets.  And in my research, I wrote a paper about initial coin offerings, which to my knowledge is the most highly cited paper on that topic, with about 700 citations, and published in a top finance journal.

And in that research, there are several elements that are directly relevant to my work on this case, including evaluating the market capitalization of tokens, analyzing price data, looking at token vesting and lockup schedules, and studying how tokens are listed on exchanges.

Q.   Dr. Howell, what were you asked to do when you were retained by the debtors in these bankruptcy cases?

A.   So I was asked to assist the debtors in determining the value of customer claims.  I understand that the debtor is liquidating its holdings of all the digital assets that it has.  And as part of that, I was asked to consider whether there may be any appropriate discounts that should apply to the various classes of assets that are being

liquidated and to which there are customer claims.

Q.    And could you just, at a high level, summarize for the Court the types of -- the discounts that you considered in your analysis in this case?

A.    Sure.  So I considered three types of discounts within the scope of my assignment.  The first reflects the fact that the markets for some of the assets that the debtors are holding are relatively illiquid, and the debtor is holding a very large quantity relative to regular trading volume.

So I estimate the price at which the debtor could likely sell its holdings, and in some cases, there is a shortfall due to price impact from selling these very large holdings.  I call that an asset liquidation discount, and I applied an asset liquidation discount to 71 of the 1,321 unique digital assets to which customers have claims.

The second type of discount reflects the fact that some claims are to assets with marketability restrictions.  So for these, I apply a discount for this lack of marketability.

And finally, I consider claims to equity and equity-like instruments, and this includes FTT, and I assign zero value to these claims.

Q.    Dr. Howell, did you prepare a declaration and report detailing your opinions and findings?

A.    I did.

MR. GLUCKSTEIN:  Your Honor, can I approach the witness to give her a copy of her declarations?

THE COURT:  Yes.

BY MR. GLUCKSTEIN:

Q.   Do you have a copy of your declaration with the annexed report in front of you, Dr. Howell?

A.   I do.

Q.   Is this the report that you prepared in connection with submission to the Court in this case?

A.   It is.

Q.   Do you also have a copy of your supplemental declaration?

A.   I do.

Q.   And you also prepared that declaration in support of the motion in this case?

A.   I did.

MR. GLUCKSTEIN:  Your Honor, at this time, I'd like to move Professor Howell's declaration with annexed report at Docket 5203, as well as her supplemental declaration at 6728-4 to evidence in support of the debtor's motion.

THE COURT:  Any objection?  Admitted with without objection.

(Howell declaration received into evidence)

MR. GLUCKSTEIN:  Thank you, Your Honor.  No further questions.

THE COURT:  Thank you.  Cross exam.

MR. BIELLI:  Good afternoon, Your Honor.

CROSS-EXAMINATION

BY MR. BIELLI:

Q.    Good afternoon, Ms. Howell.

A.    Good afternoon.

Q.    Thomas Bielli on behalf of RS Tech Limited.  Can you hear me okay, Dr. Howell?

A.    I can.  Thank you.

Q.    Thank you.  Dr. Howell, who retained you to prepare this report?

A.    Sullivan & Cromwell, on behalf of the debtors.

Q.    When did they do that?

A.    I believe in late summer.

Q.    Do you remember who you spoke to about the retention?

A.    The lawyers here, Brian and Julie.

Q.    Did you ever speak to anybody at FTX?

A.    Yes.  I spoke to Mr. John Ray as part of the retention, as well.

Q.    Do you have an engagement letter or retention letter that governs the scope of your engagement?

A.    I do.

Q.    And who is that from?

A.    It is from Sullivan & Cromwell.

Q.   Did you receive any instructions in late summer of 2023 as to what they were looking for this report?

A.   Yes.  I was asked to examine any -- I was asked to consider the various types of assets to which customers have claims and was told that the debtors would be liquidating all of their holdings of digital assets in an orderly fashion, starting on the petition date, and I was asked to assess whether any -- there should be any discounts applied as a result of that liquidation process.

Q.   And who gave you those instructions?

A.   The lawyers at Sullivan & Cromwell in concert with the team that I've been working and that has been working under my direction at Analysis Group.

Q.   Okay.  I'm going to back up for a second.  Before we get into the Analysis Group, and maybe my question wasn't clear, but what I'm looking for is who gave you the assignment.  Was it one lawyer?  Was it a group of lawyers?  Was it FTX?  Was it a Zoom?  Was it a phone call?  How did you get this assignment?

A.   The assignment, I believe, was from Brian Gluckstein and his team at Sullivan & Cromwell.

Q.   Okay.  Was that your initial interaction --

A.   And I think that -- sorry.

Q.   I'm sorry.  Oh sorry, go ahead, Dr. Howell.

A.   Just to be -- if I can just clarify.

Q.   Sorry.

A.   Sorry, just to clarify.  My understanding is that they are acting on behalf of and under instructions from John Ray and the management at the FTX estate.  But I'm not a lawyer, and so I -- and I -- I don't -- I can't speak exactly to the hierarchy on that side of things.

Q.   Right.  No, I'm not trying to trip you up.  I'm really asking, you know, who gave you instruction.  And is it your testimony that your assignment, the instructions for your assignment, were given to you by debtor's counsel at Sullivan & Cromwell; is that correct?

A.   That's correct.

Q.   Okay.

A.   I think acting on behalf of the debtors.

Q.   Okay.  And you received that engagement in the summer, later summer of 2023, correct?

A.   Yes.

Q.   Okay.  When was your report completed?

A.   In -- at the -- at -- in late December of 2023.

Q.   Your report's dated December 27th, 2023.  I assume it was completed prior to that date or close to that date.

A.   Yes.

Q.   Okay.  Was it completed before December 16th?

A.   No, it was completed on the date it was filed.

Q.   Okay.  When you completed your report, did you

send it to anybody for review before it was filed?

A.    I was the final reviewer.

Q.    Okay.  And your testimony is you reviewed it on December 27th, 2023, two days after Christmas?

A.    Correct.

Q.    Okay.  Are you full-time facility at Stern?

A.    I am.

Q.    So do you -- how many classes do you teach?

A.    My teaching load, as we say, is --

Q.    Sorry.

A.    -- three classes per year.  I teach less than that because I usually buy some out with grants.

Q.    Okay.  So how many classes did you teach in the fall of 2023?

A.    None.

Q.    Okay.  You mentioned a group.  I think it was the Assigned Group.  I apologize.  I don't have it in front of me.  Who's the name of your -- the group that you work with in your preparation?

A.    Analysis Group.

Q.    Analysis Group.  Who or what is the Analysis Group?

A.    Analysis Group is an economic consulting firm.

Q.    What does that mean?

A.    It means that they conduct various types of

analytic work to support, as I understand, a range of clients in the private and public sectors.

Q.   Are you a client of that group?

A.   No.

Q.   Okay.  What was that group's involvement in this expert report?

A.   At my direction, they conducted analyses of data and markets and conducted various calculations that I requested.

Q.   Were they paid for that?

A.   I believe so, yes.

Q.   By whom or who?

A.   I believe by the debtor and the estate.

Q.   So is it your understanding that they were -- this group, the Analysis Group, was separately retained by the debtor and not by you?

A.   I believe there is a single engagement letter that covers all of the work that I did and the Analysis Group team did under my direction, but I can't say for sure whether there may be any additional engagement letters.

Q.   Do you have an approximation as to how many hours you and the Analysis Group spent on this report from the late summer of 2023 through December 27th, 2023, exclusive of your preparation for today?

A.   I don't have that off the top of my head.

Q.   Were you paid a flat rate or an hourly rate for your services?

A.   An hourly rate.

Q.   Okay.  Do you know how many hours you billed to this engagement?

A.   I would have to go and look.  I don't remember each month.

Q.   Okay.  Have you submitted invoices for your engagement to either Sullivan & Cromwell or FTX as of today?

A.   I have.  I submit in my invoices via Analysis Group, which, as I understand, aggregates them and submits them to Sullivan & Cromwell.

Q.   And as you sit here today, you don't know the amount of hours you've spent; is that correct?

A.   I don't.  I think ballpark, I can give a ballpark number --

Q.   Sure.

A.   -- around the order of 80, but that's just an estimate.  I --

Q.   And is that estimate your hours or --

A.   My hours.

Q.   Not the asset group's hours or Analysis --

A.   Analysis Group.

Q.   -- Group's hours?

A.   Correct.

Q.   Okay.  Do you have any ballpark of what the Analysis Group spent on this report?

A.   I do not.

Q.   You mentioned during your direct, and I think you mentioned it in one of my questions, that you were tasked with valuing the debtor's assets to be liquidated as of the petition date.  Does that generally sound what you testified to?

A.   I was asked to assess the likely prices at which the debtor would be able to sell its holdings of digital assets in an orderly liquidation, commencing at the petition date, as well as to account for a lack of marketability, and finally to assess the fundamental value of FTT and equity claims in FTX.

Q.   Okay.  On the assets that could be liquidated, how long would that take?  In other words, you were doing it as of the petition date with the debtor's intention to liquidate it.  How long would that take, the liquidation?

A.   It was not part of my assignment to estimate the time to liquidation.

Q.   Do you know what it would be?

A.   No.  It would depend on how the liquidation occurred.

Q.   Did you review the debtor's plan that was filed on December 16th, 2023?

A.    No.

Q.    Okay.  Do you know that the debtor filed a plan on December 16th, 2023?

A.    I do, but I did not read it.

Q.    Understood.  You testified during your direct that -- strike that.

If I say the debtor's books and records, do you know what I mean?

A.    I think so.

Q.    Okay.  Did you review the debtor's books and records when you prepared this report?

A.    I did not.

Q.    Okay.  Why not?

A.    Because that was not within the scope of my assignment.

Q.    Okay.  It's your testimony that you did not value the debtor's -- or these assets that were held by the debtor as of the petition date, but rather a liquidation commencing as of the petition date, correct?

A.    That's right.  I have the --

Q.    Thank you.

A.    -- just to be clear.  I observe the holdings of each digital assets -- sorry -- of each digital asset, and then, I observe petition time prices and market data, and I use that information to calculate the likely prices at which

the debtor could have sold its digital assets in an orderly liquidation.

Q.   And that's where you apply the asset liquidation discount, correct?

A.   Correct.

Q.   Okay.  Did you come up with the asset liquidation discount or was that provided to you by either debtor's counsel or the debtors?

A.   I came up with it.

Q.   Okay.  Who authorized you to file the declaration and the expert report?

A.   I think this is a legal question.  No?  I think I authorized counsel to file on my behalf.

Q.   On behalf of who?  Your behalf?

A.   On my behalf.

Q.   Okay.

MR. BIELLI:  I don't have any further questions, Your Honor.  Thank you very much.  Thank you, Dr. Howell.

THE COURT:  Thank you.  Any other cross?  I think that was the only one that was mentioned before the break. Redirect?

MR. GLUCKSTEIN:  No redirect, Your Honor.

THE COURT:  All right.  Thank you, Dr. Howell.  You step down.

MR. GLUCKSTEIN:  Your Honor, that concludes the

debtor's presentation of evidence on the motion.

THE COURT:  Does anyone else have any evidence they intend to introduce at the hearing?  And we heard nothing.  We can go into closing arguments.

MR. GLUCKSTEIN:  Thank you, Your Honor.  Your Honor, as detailed this morning by Mr. Diederich and otherwise before the Court, debtors have worked tirelessly since the petition date to secure, preserve, and maximize the value of their assets for the benefit of customers and other creditors.  These assets --

THE COURT:  Oh, I'm sorry.  Hold on one second.

MR. GLUCKSTEIN:  Yes.

THE COURT:  I forgot about our YouTube folks.  We need to let them back in so they can hear the closing argument.

MR. GLUCKSTEIN:  Absolutely.

THE COURT:  So let's take a five minute recess, and we'll come back and let them -- we'-- recess until 11:35.

(Off the record at 1:28 p.m.)

(On the record at 1:34 p.m.)

THE BAILIFF:  All rise.

THE COURT:  Be seated.  Sorry for cutting you off there, Mr. Gluckstein.  Why don't we rewind and start over again?

MR. GLUCKSTEIN:  Absolutely.  I had forgotten as

well, but it's all fine, Your Honor, of course.  Brian Gluckstein for the debtors, Your Honor.

As Your Honor is aware, and as the Court heard, and the parties heard as recently as this morning from Mr. Diederich, the debtors have worked tirelessly since the petition date to secure, preserve, and maximize the value of their assets for the benefit of their customers and other creditors.

These efforts, led by Mr. Ray, have been extremely successful to date.  As the Court is aware, the size of these Chapter 11 cases are massive, with more than 2 million scheduled and filed claims by customers and other creditors located around the world.

This scope of these Chapter 11 cases also dwarfs other cryptocurrency exchange bankruptcies for, among other reasons, as reflected in the digital assets conversion table attached to the proposed order today, there are 1,321 different digital assets that are the subject of customer claims.

The debtors are in position to commence the plan confirmation process with the path to emergence from Chapter 11, and most importantly, returning value to creditors within sight.  We continue to build consensus around our plan.

As set forth in Mr. Moseley's declaration and his testimony today, the debtors need to be able to provide

adequate information in our disclosure statement, permit creditors meaningful information to vote on the plan, permit the debtors to project claims recovery information, set reserves, and ultimately make distributions -- that's why we're here -- to customers and their other creditors.

To accomplish these critical tasks, the debtors need to value every claim that's based on a digital asset. This case is unusual in that every one of those millions of claims based on digital assets is currently unliquidated.

While the majority of the value of claims are denominated in fiat or stablecoin, there are approximately 79 percent, as set forth in Mr. Moseley's declaration, of all creditor claims that include at least a component, in part, claims based on digital assets that are not readily converted to us dollar values.

As has been clear from the first day of these cases, due to the fraud committed by Mr. Bankman-Fried and other insiders, the debtors did not have sufficient digital assets on the petition date to consider a structure of returning digital assets to all customers in kind.

Armed with the orders entered by this Court, the debtors have been, as Mr. Diederich discussed this morning, strategically monetizing its remaining digital assets, where appropriate, to maximize the cash assets that ultimately will be available for distribution to creditors.

The plan that's on file is premised on providing U.S. dollar recoveries to creditors, and it is therefore necessary for these claims to all be dollarized and to permit them to be addressed alongside the existing fiat and stablecoin claims that the debtors have.

To do that, prices for the claims based on digital assets need to be established, and the debtors seek to do so by estimating those claims pursuant to Section 502(c) of the Bankruptcy Code in accordance with the proposed valuation table that's attached to the revised order.

As detailed in our papers and the evidence that is now before the Court today, the debtors believe the pricing and methods for setting those prices before the Court is both appropriate and fair to creditors.

We noticed this motion to millions of stakeholders, and while we certainly have received objections, the overwhelming majority of those creditors have not objected to either the process or the pricing that's set forth in that table.

And Your Honor, the disparate and often conflicting positions that have been taken by certain of the objectors, who plainly are looking for ways to increase their claim recoveries at the expense of others from a finite set of assets, necessitates a comprehensive solution that both complies with the requirements of the Bankruptcy Code and

treats creditors and their finite pool of distributable assets most fairly.

As Mr. Moseley's testimony establishes, any need to liquidate the value of each claim based on digital assets on an individual basis would unduly delay these cases and distribution to creditors.

This is due to the fact that the claims based on digital assets, as we've heard, are scheduled and filed in quantities of digital assets in accordance with the procedure set out in the bar date, notice, and order that was approved by this Court.

This issue has been identified since the early stages of the case and certainly noticed out to all creditors as early as the bar date notices that went out last year.  We submit there cannot be a serious argument that these claims that are held in denominated digital assets are, in fact, liquidated.

In considering the question, courts look at the question of whether a claim is capable of ready determination or not, and that has been done in the context of estimation proceedings under 502(c), as well as many other analogous contexts.

There's a suggestion today to Mr. Moseley that the debtor could have simply priced these assets and scheduled the claims in dollars.  And we heard from Mr. Moseley that

the debtor's conclusion was that with respect to the spot assets on the tokens and coins, they did not have reliable information to do that in the books and records of the company.

And so, Your Honor, for the debtors to have done such an exercise would have been the debtors unilaterally choosing some form of a market price to determine the value of these digital asset claims.

And while there have been some complaints around this estimation process that have been lodged, we submit what the debtors have done here has provided more due process and more transparency than has happened certainly in even some of the other large bankruptcy, crypto bankruptcy cases.

We filed the motion.  We noticed it to all creditors, millions of people.  Everyone has had an opportunity to come forward.  Everyone had the opportunity to interpose an objection.

Everyone had an opportunity to say, I need time, in advance of today, to contest the valuation with respect to any aspect of the experts of Mr. Lu's testimony or Dr. Howell's testimony that were presented to Your Honor today.

A handful of those objectors did so.  We've been working constructively with those objectors, as I outlined this morning at the outset of the hearing, to set a subsequent hearing date on the valuation of that small subset

of tokens that Your Honor will consider subsequent to today, currently on March 20.

But it is clear from the evidence that is now before the Court and how that evidence was put together, and analyzed, and calculated that how pricing to establish a valuation for these novel digital assets trading on markets that are at different prices, different times around the world is far from readily determinable or easy.

We submit the evidence before the Court details a comprehensive and deliberative process that was undertaken to arrive at the estimated asset value set forth on the digital assets conversion table.  Mr. Lu explains how he and Coin Metrics set baseline petition time pricing for the digital assets that they priced.

Professor Howell explained how each and every digital asset, all 1,300 plus, was analyzed to determine if a further adjustment to the valuation was necessary due to the particular facts and circumstances involving the asset and these debtors on the petition date.

We have addressed in our reply papers that were filed at length the various objections, but I want to just touch on a few points in summary fashion at this time.

Professor Howell, in her testimony today, touched on the question of FTT, one of the areas she looked at. That's the native token of the FTX exchange.  And her

conclusion and that of the debtor is that that token has no fundamental value because it has no utility outside of an operating exchange which did not exist on the petition date, as Mr. Diederich updated the Court and the stakeholders this morning, will not exist at this point going forward.

Without an operating exchange, every source of FTT value is eliminated.  Professor Howell explains that the market prices for FTT were unreliable and likely distorted in the period leading up to the petition day due to concealed fraud at FTX.

Professor Howell's report and supplemental declaration explains the valuation of claims based on futures positions, as though futures positions had been closed out by the holder at the petition time.  One of the objectors that has been active asking questions today is such a holder of futures positions.

The debtor's view, as expressed by Dr. Howell, is that this is the most consistent way that future contracts operated, and consistent with how futures contracts operated, and with the fact that the debtors ceased operations and filed for bankruptcy.  That testimony, as an evidentiary matter, is now unrefuted and in the record of the Court.

Futures traded on FTX were not an exchange of assets between the parties but rather resulted in fiat denominated profit and losses for that transaction's betting

on winners and losers.

Perpetual futures, which are common with respect to digital assets, use a funding mechanism in which two parties in the contract make periodic payments depending on whether the future's price is above or below the price of the underlying reference asset.  As the price of the P&L changes, the customer's P&L changes.

As explained in Dr. Howell's testimony, every day the debtors conducted an exercise every 24 hours to reprice supposedly mispriced perpetual futures contracts, meaning that creditors would have potentially received payments through this system prior to the petition date.

The arguments and the objections that have been put forward objecting to the debtor's pricing of futures fail for numerous reasons that we detail in our papers and in Dr. Howell's supplemental declaration, which is, very briefly, as testimony explains, that's now before the Court.

The debtors bankruptcy filing cannot be equated with an accelerated settlement and delisting event, which is the primary argument that's put forward by the (inaudible). We have no evidence to the contrary.  The debtors did not delist the futures or underlying tokens, but rather the debtors ceased operations in their entirety.

Second, unlike spot tokens, futures and other derivatives were FTX-specific financial contracts whose

payoffs were inherently tied to the market dynamics of the debtor's exchanges.  As a result, customers with futures positions on the debtor's exchanges were exposed to the risks of the debtor's futures markets specifically.

And third, Your Honor, making after-the-fact adjustments to futures prices would be inconsistent with how the debtor's exchange has operated historically and could certainly result in negative balances for certain of our customers.

Repricing supposedly mispriced perpetual futures contracts could also unfairly benefit those creditors who could have received payments through the funding rate system that's detailed in our papers.

The proposal that's being made is simply a reallocation of value between customers and presumably, if adopted, would be objectionable to other customers who are not here today.

This highlights the issue more broadly.  The debtors, through this motion, have sought the most fair and reasonable valuation of claims based on digital assets so that we can set a fair and reasonable process and march forward towards returning that value to our creditors.

Finally, Your Honor, I want to just note that numerous of the pro se and other objectors raise different versions of an objection that customers may claim a property

interest in certain of the digital assets.

The revised order that's before the Court makes clear that nothing in this motion, or the order that we have asked the Court to enter, seeks to address or preclude any party's rights with respect to whether any digital assets constitute customer or other creditor property.

All parties' rights reserved with such arguments are fully reserved.  We've discussed that issue.  We've announced the settlement we have with the ad hoc adversary proceeding, which is the only adversary proceeding that's been filed on an issue.  But we understand that those arguments remain outstanding for certain creditors.  They can be asserted.  We will address that issue in connection with plan confirmation.

But there is nothing about anybody asserting I have a property right that is precluded by entry of the order we're asking today.  And we clarified that and made that expressly clear in the revised form of order.

The revised order similarly contains some other reservation of rights, provisions to make clear that certain other issues that could arise in this case are unaffected by this order.  That has -- we've worked with other parties to address.

And of course, all valuation arguments with respect to the four tokens is deferred until the March hearing are

fully reserved, as we've been talking about over the course of the day.

So I'll pause there, Your Honor. I'm happy to take questions from the Court or let others speak. I would request time on rebuttal to the extent based on any arguments that are made today with respect to any of the still outstanding objections.

THE COURT: Okay. Thank you. I have no questions at this time.

MR. GLUCKSTEIN: Thank you, Your Honor.

THE COURT: Let me hear from anyone who wants to speak in support of the debtors.

MR. PASQUALE: Thank you, Your Honor. Excuse me. Ken Pasquale from Paul Hastings for the committee. Your Honor, for such an important motion, I actually have very little to say right now. And the reason for that is the committee has been working very closely with the debtors over a number of months with respect to the evidence and the arguments that are being presented today.

For the committee in its role as a fiduciary for all creditors, the committee can't pick winners and losers. And so our role, as we saw it in this process, was to make sure that the methodology being applied to value all of the digital assets as of the petition date was fair and reasonable, and that the methodology was appropriate across

the board for all creditors, regardless of their digital assets, holdings.  And we think that the presentation, the evidence today, Your Honor, satisfies that standard.

The only other thing I'd like to say now, Your Honor, and I'll reserve any other comments for rebuttal, if I may, is just with respect to the estimation process.

Obviously, and I think Mr. Moseley testified well as to how long it would take to litigate each and every one of the customer claims with respect to the value of digital assets.  Just look at the number of individual objections that were filed to this motion raising individual issues and individual values for their respective holdings.  To litigate all of those would take us -- I won't even estimate. Certainly would not make the committee or our constituency happy to delay confirmation.  And more importantly, what follows.  And that's the distributions.

The other thing, Your Honor, that I think is important to note is the uniformity that the estimation process would provide if the debtors and the estates had to litigate each and every one of the individual's claims on an individual basis.

We can talk about collateral estoppel and the like, but none of those findings would be binding on any other customer.  They would be binding, perhaps, on the estates.  It's obviously a process that is completely

inefficient and not equitable for the estates, generally, and the creditors, specifically.

So unless the Court has any questions, I'll defer any further comments.

THE COURT:  No questions.  Thank you.

MR. PASQUALE:  Thank you.

THE COURT:  Anyone else would speak in support of the motion?

MR. MINTZ:  Good afternoon, Your Honor.  Doug Mintz of Schulte, Roth and Zabel for Steadview Capital, Mauritius Limited, which holds a preferred equity, holds preferred equity interests, which are detailed both on Docket 450, as well as Steadview's proofs of interest.

Last month, we read the original motion to estimate as well as the order and Dr. Howell's testimony and the conversion table to seek to value preferred equity somehow at $0.  We were concerned in particular, with, among other things, paragraph 33 of the motion, paragraph 85 of Dr. Howell's testimony in lines 509 through 521 of the conversion table.

We reached out shortly thereafter to debtor's counsel and raised this concern with them, which they addressed with us very constructively.  And we appreciate that.  We worked collaboratively with them as well as some others, and they acknowledged that wasn't their intent.  We

worked together to develop what is now paragraph 5 of the order, which I believe makes clear the intent here is not to estimate the preferred equity in any way, shape, or form and reserve those issues for another day.  I'll let the language speak for itself.  But we appreciate that those issues have been reserved, presumably, for some process as part of confirmation.

I don't have anything else for Your Honor.  If you have any questions, happy to answer them.

THE COURT:  No questions.  Thank you.

MR. MINTZ:  Thank you, Your Honor.

THE COURT:  Anyone else in support of the motion?  All right, turn to the objectors.  Who wants to go first?

MR. BIELLI:  Good afternoon, Your Honor.  Thomas Bielli on behalf of RS Tech Limited.  Can Your Honor hear me okay?

THE COURT:  I can.  Thank you.

MR. BIELLI:  Your Honor, my client's objection falls into three categories.  First one being procedural, second one being substantive, the third one being the methodology.

Procedurally, this is an unfair process, Your Honor.  Frankly, this is a violation of my client and every other creditor subject to this motion's due process.  This was filed two days after Christmas on December 27, the week

between Christmas and New Year's on 14 days' notice.
Contains two expert reports totaling over 100 pages and
predicated on thousands of pages of data.  It curtails our
client's and other creditors' rights to the normal, ordinary
claims reconciliation and adjudication process that was
outlined by the debtor's expert.

That's because what this is, ultimately, is a
claim objection or claim disallowance motion.  Claims are
deemed allowed when they're filed, Your Honor.  The debtors
then filed an objection, claim objection, to which creditors
have a right to respond to.  There's limited discovery filed
by an evidentiary hearing and this Court's adjudication of
that claim.

But that won't happen here.  What's being proposed
by these debtors turns the ordinary normal claims
adjudication process on its head.

THE COURT:  This isn't a claims adjudication
process.  It's an estimation process.  The Courts are very
clear.  An estimation process is subject to the discretion of
the bankruptcy judge.

MR. BIELLI:  Are they are used, Your Honor, in
asbestos, mass tort claims.  And the debtors cite to those
cases in their motion.  But they don't link it to this case
here, Your Honor, because there's estimation -- in those
cases, the estimation process is akin to a trial process

where those claims do get adjudicated.  Experts are retained, they're examined.  That's not going to happen here.  But I'll move on, Your Honor.

THE COURT:  It's not required.  There are other cases where the courts have said I could look at the pleadings of the case and decide the value on an estimated basis of that claim.

MR. BIELLI:  I understand, Your Honor, and I do understand that.  And I know that other courts in other crypto cases, like the Celsius case, for example, up in the southern district, under Rule 1009, the judge ordered that the debtors take this digital asset conversion table, attach it to their amended Schedule AB, and then list it.  Because that's what we're doing, Judge.  We're valuing the debtor's assets.  We're doing a liquidation analysis.  That's what this is.

Dr. Howell testified on the stand that what she did at the debtor's direction was a liquidation analysis, and it took her 80 hours.  We had the debtor's expert, Mr. Moseley, testify that his process took two to three months.  And for Your Honor to rule or for Your Honor to make a finding that we have this undue delay, unduly delayed the bankruptcy process, we had expert testimony today, or testimony from the debtor and testimony from Dr. Howell.  She spent 80 hours.  Mr. Moseley spent two to three months.

There's delay.  And delay is okay because Your Honor has a pretty big job to do here.  And delay is okay because the creditors, committee's constituents, everybody on Zoom, they want Your Honor to get it right.  They want you to get it right.  They don't want to have this rushed by the debtor and their expert, who, quite frankly, have been working on this since the summer, and then file it, lob it out two days after Christmas.

THE COURT:  Did you file a motion for a continuance?

MR. BIELLI:  No, Your Honor.  I'm going to move on to the substance, Your Honor.  In the Dow case, the bankruptcy law's general rules to liquidate, not to estimate, Your Honor.  I tied that into the procedural objection.  Your Honor would need to make a finding that the normal, ordinary claims process will unduly delay these bankruptcy cases.  The bankruptcy process in itself.  The debtors haven't made that showing, Your Honor.

And as I mentioned, the delay is okay.  It's unduly delaying the case that's the problem, not just any delay.  Some delay is justified, and Your Honor will need to make that finding.

In some of the other cases I knew Your Honor was getting to, especially with respect to the mass torts that I mentioned, those estimations were done when a distribution

was imminent, and the distribution would be delayed if this estimation wasn't the case.  That's not where we are in this case.  In fact, Your Honor, these debtors filed a plan, a good faith plan, on December 16th that now is going to be changed based on something filed eleven days later, which was this motion.

What Your Honor didn't mention or, Your Honor, excuse me.  What the debtors didn't mention today, and I didn't hear anything about this, was other types of valuations of the petition date.  We heard a little bit about the books and records, but we didn't hear as to -- or at least in depth -- as to why the debtors -- because, again, we're valuing the debtors assets is what they're seeking to do, and they're calling it the claims, but they're valuing what the debtors holding as of the petition date, presumably the debtors books and records, has this information.

We've heard testimony from Mr. Moseley was really the response to that was we didn't rely on that, and it stopped there.  I don't want to put words in his mouth -- or we didn't trust that information, and it stopped there without any further information.  I think that's important, Judge.

THE COURT:  Well, let me ask you a question.  You asked questions to Mr. Moseley about why the debtors didn't do this and ask the claimants to file their proofs of claim

in dollar amounts instead of the amount of crypto they held. In particular, type of crypto they held. But whether they did it as the amount of crypto they held or the dollar amount, I'd be in the same position. I'd still have to determine whether that dollar amount was correct or not. I'd still be estimating the claims.

MR. BIELLI: Well, Your Honor, if they -- Your Honor, allow me on this. If a creditor put in their proof of claim, if they listed a dollar amount, then I'd argue that that claim is liquidated. And Your Honor has to make two findings. You have to make a finding that these claims are either unliquidated and contingent, and that the claims adjudication process or liquidating those claims is going to unduly delay this case.

THE COURT: Well, I think you're making the case for why it would unduly delay the case. Because if someone put in their proof of claim, I held Bitcoin on the petition date, but I'm going to value it three months later when the Bitcoin went up, now, I got a question. Okay, now, there's an objection to that.

And then there's someone else who files -- has a different type of cryptocurrency, and they say, hey, on the petition date, my crypto was worth x, and now it's worth much less than that. I want you to use the petition date. Now, I've got to decide all those issues on an individual basis.

And don't forget, I've done this before.  I sat on the other side of this bench before.  I know how this process works.

MR. BIELLI:  I understand, Your Honor.  I understand what you're saying.  I understood Your Honor's ruling with respect to the IRS on that estimation.  And it will be done on the petition date, or, I'm sorry, your preliminary ruling today that it will be done on the petition date.

And if a creditor signs, under penalty of perjury, their claim objection that they have Bitcoin worth x on the petition date, that's deemed to be a valid claim until someone files a claim objection.  Well, now it isn't if Your Honor grants this motion.  It's not.

THE COURT:  I'm not adjudicating the claims.  I'm not allowing or disallowing any claim.  I'm estimating what the claims are.  That process happens later.

MR. BIELLI:  I understand, Your Honor, and that's all I have for my argument, and I appreciate Your Honor listening to me today.

THE COURT:  Okay, thank you.

MR. BIELLI:  Thank you, Your Honor.

MR. GWYNNE:  Kurt Gwynne from Reed Smith on behalf of the Foundation Serendipity and Foundation Elements, creditors.  Your Honor, the debtors have neither a right nor a need to estimate our clients' proofs of claim.  Section 502

only authorizes the estimation of contingent or unliquidated claims.  On page 13, footnote 8 of the debtor's omnibus reply, the debtors concede that our clients' claims are not contingent.

Our clients' claims also are not unliquidated.  As the debtors acknowledge in paragraph 30 of their omnibus reply, our clients did file claims in U.S. dollar amounts, approximately 300 million, based on a conversion rate for MAPS and OXY tokens.  And by the way, our proofs of claim, Your Honor, were filed based on the values on the petition date or very near the petition date, whichever information was available.

But the debtors argue in paragraph 27 that a claim is liquidated when the amount of it can be determined with relative ease.  Well, it really doesn't get much simpler than the liquidation of a claim here, Your Honor.  You take the number of tokens you have, and you multiply them by the conversion rate.  It's that easy.

The debtors dispute the claim.  They may dispute the amount of the claim, they may dispute whether the conversion rate is appropriate, but the claim itself is easily liquidated.  It's no different than if a debtor was objecting to a creditor's -- a secured creditor's claim on the basis that the interest was calculated incorrectly. Maybe they used the wrong SOFA or the wrong base rate.  It's

similar to that situation.  This is a dispute regarding the claim.  It's not a dispute regarding whether the claim is liquidated.

For that reason alone, as a matter of law, Your Honor, 502(c) does not apply, and the debtor cannot estimate our client's claims regardless of any alleged delay in the confirmation process.

Now, even assuming that our clients' claims are unliquidated, and they're not, the debtor still cannot estimate the claims because there would be no undue delay in the administration of the case with respect to resolution of our claims in the normal process.  There should be neither a delay nor an unduly long delay for several reasons.

First, Your Honor, I do want to point out, this is a problem that the debtor has created itself, and this motion was the solution to the problem they created.  The debtors filed their schedules.  There was testimony.  Well, at that time, we weren't comfortable with the available conversion rates.  And I think technically what the witness said is he wasn't comfortable with the debtor's systems regarding what the conversion rate was.

But the debtors have filed multiple amendments to their schedules.  And in fact, on the exhibit list for today, they listed amended schedules that were filed in June of 2023, and then again in January 23rd or 24th of 2024.

When the debtor files its amended schedules, it can list claims as disputed.  It can put the dollar amounts in there.  It could list all the two million claims, list them as disputed.  If the creditors don't object or don't file a proof of claim, then that would resolve those claims.  But the debtor chose not to do that.

The other thing the debtor could have done is, in the bar date motion, not to just ask creditors to file proofs of claim in the amount of the tokens that they held, but to put a dollar value on them.  Because in many cases, the debtor may agree with them.  The debtor may use the same -- would have used the same conversion rate, or one very close to it.

And I do agree, Your Honor, if someone files a claim and they're valuing it in a dollar amount, but they're not using the petition date, then that would be wrong.  And that claim is one that debtor may be able to object to.  But I don't know that it's an estimation.  It's that the claim is improper because it's using the wrong conversion rate.

THE COURT:  Wouldn't I have to look at every single claim and the debtor would have to look at every single claim to see if when the claimant filed their proof of claim that the dollar amount they put in was actually the dollar amount on the petition date and not some other date?

MR. GWYNNE:  Yeah, but the debtor has to do that

anyway.  Even when Your Honor estimates claims, right, the debtor has to look at each individual claim and determine what the value of that claim is based on your ruling.  They have to do that anyway, either in objecting to the claim or determining, okay, Your Honor says -- like you said today -- this is the relevant date for the valuation of creditors' claims to petition date.

So debtor is going to have to make sure claims comply with that.  Just estimating them and saying that's true and waving the magic wand doesn't mean that someone doesn't have to review the claims to make sure that they comply with your ruling.  That has to happen in any event.

THE COURT:  But they're estimating them as a whole, not one off.  And I don't have hundreds or thousands or tens of thousands or hundreds of thousands of objections.  When the debtor files an omnibus claim objection and all of a sudden I've got thousands and thousands of claimants filing objections saying, wait a minute, no, that's not how I valued it.  Or they're saying, wait a minute, I didn't hold one Bitcoin.  I held three Bitcoins.  Or, no, I didn't do this.  I didn't do that.  I have to do them individually.  That process would take forever.  Tell me how I would shortcut that process.

MR. GWYNNE:  Well, Your Honor, I don't know that you need to shortcut that process here, but I think I already

said how it could be shortcut.  One is if the debtor filed amended claims and you list the claims with the appropriate amount that you think the claim should be asserted in.  If the creditor files a proof claim, then it's challenging.  If it doesn't, that amount is binding.  Or you list it as disputed.  And if they don't file a proof of claim, then that amount governs.

But that's a lot fairer than this process, Your Honor, which was started between Christmas and New Year's Eve and giving people 15 days' notice to deal with what really amounts to a disallowance of claims.

THE COURT:  I'll ask you the same question.  Did you file a motion for a continuance?

MR. GWYNNE:  We did not, Your Honor, but we had negotiate it -- we negotiated, as I indicated earlier, that our claims aren't being valued today.  The only question for our clients is whether or not estimation is appropriate.  Our claims are not going to be estimated or valued based on Your Honor's ruling today, and that won't prejudice us in any way as the agreement that we have with the debtor is set forth in their revised proposed order.

By the way, that's important because this proposed asset liquidation discount is unprecedented, has nothing to do with the creditor's claim.  It's the debtor's assets.  But that -- we'll deal with that later in connection with our

claim.

We're prepared to proceed on the liquidation of our claim in the first week or two of April. The debtor is proposing the estimation of our clients' claims, the OXY and MAPS claims, on March 20th. That's not undue delay to push it back for a couple more weeks. That, I think --

THE COURT: That issue is not in front of me today.

MR. GWYNNE: Well, but the issue of whether estimating our claims or not is appropriate is before you. And what I'm telling Your Honor is that we are prepared to go forward on a regular litigation of the claims in early April, and I think that should be relevant to Your Honor and whether you decide that estimation is appropriate with respect to our clients' claims.

And that's just really a few more weeks more than what the debtor is proposing for an estimation hearing, and we're saying we don't need the estimation hearing. Let's just have the claims allowance or disallowance hearing a couple of weeks later.

Additional month, I don't think it's undue delay when you look at the process here. The debtor's witness took approximately four months to prepare their expert report. We were given 15 days over the holidays to respond. We did respond. We have retained experts as a backup plan, have an

agreement that if we have to have an estimation, that it wouldn't be today, it would be in the future. But reserve the right to say that we shouldn't have an estimation hearing. We should have an allowance or disallowance of our claim.

Dr. Howell, according to her report, reviewed over 200 legal documents, articles, books, studies, websites, and data sources. The creditors should have a similar opportunity, Your Honor, to conduct that type of review and analysis. And of course, they have another expert report from Mr. Lu. And all of these were being -- all of that work was being done when the creditors had no idea what was coming. Debtors counsel says, we noticed this to people before.

All the debtors said was at some point they would come up with valuation. They never said we would try to estimate everyone's claim on 15 days' notice over the holidays. That was never noticed to the creditors. And Your Honor does have -- if estimation is proper, under 502(c), Your Honor does have discretion to determine the method. And what we're saying, Your Honor, is if you're going that route, we should be given a little more time, fair opportunity, and just have --

THE COURT: You've been giving that. Are you speaking on behalf of other creditors?

110

MR. GWYNNE:  Well, no, I'm speaking on behalf of our client.  And Your Honor, when you talk --

THE COURT:  You already got that taken care of.  There's going to be another hearing.

MR. GWYNNE:  Right.  But we don't have -- the issue we don't have taken care of is whether we're going to go to that estimation hearing or we're going to have a claims allowance hearing or disallowance, a regular hearing, not an estimation.

The debtor's witness testified that our clients' claims are less than half a percent of all the claims.  If the concern is we need to give an estimate in our disclosure statement as to the recoveries, and we need to give an estimate that has some reliability so people can determine whether to vote in favor of the plan or not, well, then not estimating our clients' claim still gives everyone else 99.5 percent certainty because our claims are a small subset, as debtor's counsel said.  We're just actually a part of that small subset of claims that aren't being estimated today.

If the debtor gets the relief it's asking for and all the other claims are estimated, then there's really no reason that our claim needs to be estimated at that point, because now we don't have all these claims that have to be estimated.  We have a small handful.

And I would request that Your Honor give us that

opportunity to have the regular claims hearing, because the debtor is seeking to disallow our claims in full.  And that's significant.  And when you're determining the type of estimation proceeding or whether or not -- the Third Circuit, you mentioned Bittner earlier, and the fact that Bittner said that, in some instances, well, you had indicated there was case law saying, in some instance, you can maybe just decide estimations on the papers.

But in Bittner, on page 135, the Third Circuit said, in some cases, maybe a rare or unusual case, but in some cases, you might actually need a jury trial to estimate a claim.  So obviously, there's a big, wide disparity in what might be required to estimate a claim.  And here, rather than fight about that, seems easiest that if the debtor gets the relief it's looking for today, that we just deal with our claim on the claims allowance process, not an estimation process.

That's all I have, Your Honor, unless you have any questions.

THE COURT:  Thank you.  No questions.

MR. GWYNNE:  Thank you.

THE COURT:  Anyone else?

MR. O'DONNELL:  Your Honor, Dennis O'Donnell, DLA Piper, again, on behalf of MAPS Vault Limited.  Your Honor, MAPS Vault holds over 7 billion tokens, MAPS, OXY, and Serum

tokens, which, based on publicly available prices on the petition date, were valued, as we state in our proofs of claim, at approximately $525 million.

If the debtors estimation, as currently proposed, were to be accepted, all but a couple of million dollars of that $525 million would go away.  So, clearly, we have a lot at stake here and want to make sure that this process works as best as it can for us.

As Mr. Gluckstein indicated, we have been among the group, I think we were the initial member of the group, working cooperatively with them to come up with a process that works.  And we do have a schedule in place which involved the delivery of an expert's report this past week, a rebuttal coming from them next week, and discovery to follow that, which we believe covers most of what we need to cover.

But that being said, we still think that we have an entitlement to more because we don't think that estimation, as presented here, with respect to the millions of claims, should necessarily control how a very small subset of the claims, which includes the MAPS, OXY, and Serum claims.  I mean, basically the 71 claims that Professor Howell referred to amongst the 71 tokens, amongst the 1,321 is a subset that should have really been on a separate track to start with.  And of those 71, I think there's only a fraction of those which may well be represented by the

parties who have now been moved into this later hearing that should be entitled to a separate process.

Whether we call that process estimation or allowance may be at this point a matter of just terminology. I think what we have on the table going forward will be a full process with discovery and a hearing, an evidentiary hearing with witnesses that will take place as proposed now on March 20th.

But again, because I think we have an entitlement that I'll get to in a second, I would only ask that we have flexibility built into that process. We now have four or five, six different participants in it. It may be that things need to get moved around. It may be that hearing needs to get moved to some extent. And based on the fact that I think properly there should have been an allowance hearing, that flexibility should be acknowledged.

And to reiterate much of what Mr. Gwynne said, there are two reasons why, at least as to our clients, we're not talking about the millions and millions that would create great headaches for the Court and the debtors. We're talking about this small subset of customers here which include my client.

As to them, number one, their claim is, from their perspective, I think from any reasonable perspective, liquidated. As Kevin Lu, one of the debtor's witnesses,

acknowledged, there are parties -- maybe it was Mr. Moseley. There are many parties who did, in fact, include dollarized amounts, dollarized claims on their proofs of claim, and our client was one of them.

And they did that not, as the debtors would portray it, as a customer's estimate. They did a very simple calculation which comports with what doesn't require estimation, which is that something that could be determined with precision by a pure mathematical computation.

And what they used here was an input -- with two inputs, the number of tokens they have multiplied by a publicly available, trustworthy source for what the price was on the petition date. They used Coin Market Cap, which is the same source that is acknowledged in Professor Howell's report as a source to which she went when Coin Metrics could not provide the source or provide pricing data for that date, and it's also a source that she cites 51 times in her report for other reasons.

So again, a reliable source, quoting a price applicable on the petition date, multiplied by the number of tokens that no one disputes that were held by our clients on that date. That sounds to me like more than a customer's estimate and suggests that the claim is, in fact, liquidated. The fact that the debtors want to dispute it doesn't change the fact that it's liquidated. It simply means they're going

to dispute it as they would any other type of purportedly liquidated claim.

There's also no undue delay that would be caused here by turning this into a full-fledged 502 AB allowance scenario, because I think we'd be effectively somewhere where we are already. Even though the debtors wanted to do this in about three weeks, we're now talking about doing it in about two to three months with flexibility.

Again, because I think we would have an entitlement, we have every right to argue as to this subset of creditors that this should have been teed up as an allowance process. Going forward with what we have on the table as modified to accommodate everyone who's now part of the mix here should be something that, again, if we need to come back to the Court, we will come back to the Court to talk about whether that needs to be modified.

As currently memorialized, it is not actually an order. I think what we probably need to do is to build that schedule into some kind of order that will permit modification if need be, if issues arise. Don't foresee them at the moment, but if issues arise, we may need to come back to the Court to address them.

THE COURT:  Thank you.  Anyone else wish to be heard?

MR. MCNEILL:  Good afternoon, Your Honor.  For the

record, Steve McNeill from Potter, Anderson & Corroon here on behalf of the Layer Zero Group. Your Honor, unlike the others, I bring good news, Your Honor. During the course of the hearing, I was able to resolve the remaining aspects of my client's objection with the debtors.

Just for background, we had asserted -- my client holds potential 502(h) claims related to an avoidance action that's been filed against them. We asserted that 502(h) claims were different and should be excluded from the process.

The debtors had added some language to the proposed order carving out those claims. We had some additional tweaks. That is in, I believe, it's paragraph 8 of the proposed order that was filed this morning.

Just wanted to note for the record that we have a couple of additional, little bit of modified language to that paragraph, Your Honor, and specifically paragraph 8(b). Right after the (b) we are adding have any precedential value or before the word prejudice that's there currently, and right below that treatment of any claims asserted in, we are adding or arising from before any action, Your Honor. And with those changes, my client's objection is resolved. I would ask counsel for the debtor to confirm that on the record. But that is the resolution we have agreed to, Your Honor.

THE COURT:  Okay.  Thank you.  Anyone else in the courtroom?  Mr. Lusk, I see you have raised your hand.  Do you want to say something?

Can you give me co-hosting rights, please?

Mr. Lusk?

MR. LUSK:  Yes, Your Honor.

THE COURT:  Can you turn on your camera?  You need to turn on your camera, please, so I can see you.

MR. LUSK:  I cannot start video because the host has stopped it.  Could someone please report that problem?

THE COURT:  Mr. Lusk -- we need to give him video back.  Once you disconnect him from video, he can't turn it back on again unless you give permission.  There you go.  Go ahead, Mr. Lusk.

MR. LUSK:  Okay, great.  Thank you.  So, I would like to raise an objection to the motion in terms of the generality of the language envisaged in the second paragraph. The debtors refer generally to authorization to determine the value of claims based on digital assets, and in my view, this is far too general.

In my particular case, I held at the petition date or had deposited on the ftx.com exchange digital assets, and I received afterwards a schedule in which I saw that the debtors had purported to mischaracterize my claims as general unsecured claims in an indeterminate amount.  However, they

did correctly specify the precise amount of crypto assets I held on the exchange.

So I filed a proof of claim in which I objected against the mischaracterization of the nature of my claim and stated very clearly that my claim is, in fact, a claim for restitution in specie of the particular crypto assets which are specified in the claim.

These claims are held in accordance with the terms of service interest under English law as specified therein, and I requested relief in the form of immediate return of my crypto assets because these assets are my property.  They are not the property of the debtors.  They cannot possibly be part of the debtor's bankruptcy estate, and therefore, they cannot be a subject of any estimation that Your Honor may make which can only relate to the debtor's bankruptcy estate.

The language which is set forth in the proposed motion is far too broad, and it doesn't resolve the issue that the debtors have issued schedules in which claims are mischaracterized.  It does not take into account that there are on the docket objections, including objections at the proof of claim stage to their miscorrect characterization of such claims.

I have filed not only an objection at the proof of claim stage on the 29th of September 2023 but I also have objected on the 9th January of this year to the debtor's

motion to estimate claims, and on the same basis that they have mischaracterized the nature of my claims, I claim immediate restitution in specie of my crypto assets because these are not assets of the debtors, they are my assets as is specified in the terms of service.

The debtors have not disputed that at any stage, despite what Mr. Gluckstein has said for the debtors, at no stage have the debtors responded in any way to either of my objections.  Much time has passed.  It must therefore be understood that the debtors have nothing to contend contrary to what I have stated in objection at proof of claim stage and in the present month.

And therefore, I would request not only that the (inaudible) be suitably amended in the proposed order to carve out the case of my claim and that of the further FTX customers in my position, but also that there is no reason whatever why the debtors should not now be awarded, with immediate effect, to restore return my crypto assets to the addresses that I've specified in my most recent objection, dated the 9 January and filed on the 12th of January.  It is document 5684 on the docket.

THE COURT:  Mr. Lusk, I'll let Mr. Gluckstein respond to you in more detail, but as was discussed at the beginning of the hearing or the opening statement by Mr. Gluckstein, the issue of whether or not any particular

claimant has title to the crypto that is being held by the debtor is an open issue, and they have included in their order language to make clear that that issue is not being decided by the estimation process, and it is something that can be raised at a later date.  So that's something that will be resolved later on.

For today's purposes, I'm being asked to estimate the claims so that the debtors can file their disclosure statement in order to solicit votes on the proposed plan that they are putting forward for resolving the bankruptcy case. Allowance of claims or disallowance of claims happens at a later time.  What I'm doing today in an estimation process is not allowing or disallowing any particular claim.  It's only estimating the claims for purposes of allowing the debtors to move the case forward.  Did I make that clear?  Is that understandable?

MR. LUSK:  The language which appears in the document referred to in the agenda, which is Document 5202 filed on the 27th of December 2023, states in the proposed order at item two, the debtors are authorized to determine their claim based on digital assets and fiat currency for the purposes of any plan in these Chapter 11 cases, based on the value set forth in the digital assets conversion table attached hereto, Exhibit 1.  It is this language which I say is too broad.

THE COURT:  Well, that language is in the motion. And the only thing that's going to govern here is the order that I enter, and the order that the debtors have put forward says that the issue of ownership is still an open issue and is not being decided today.  So it's my order that governs how the process goes, not what the debtors may or may not have put in their motion seeking the estimation process.

MR. LUSK:  I understand (inaudible) speaking against the motion.

THE COURT:  Right.  But as I said, that issue, the debtors went back later and added additional language to say -- to resolve this issue, because it had been raised by other claimants that there was a question about who owns the crypto.  And the debtors have resolved that by including language in the form of order that says that's still an open issue.  It's not being decided today.

MR. LUSK:  Okay, well, I think we have clarity on the point.

THE COURT:  Okay.

MR. LUSK:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. LUSK:  Yes, sir.

THE COURT:  All right, Mr. Gluckstein, any response?

MR. GLUCKSTEIN:  Yes, Your Honor, Brian Gluckstein

for the debtors.  Happy to -- I'd like to make just a few points in rebuttal on what we've heard here from the objectors, starting with Mr. Lusk's point there.

Your Honor obviously hit the issue on the head. What I'm hearing him articulate is effectively a property argument.  We have added what's in paragraph 4 now of the proposed form of order, a clear reservation of rights on that issue, as I discussed earlier.

Obviously, the debtors reserve all of their rights, as well, with respect to those arguments, but they're not before the Court today.

With respect to the other objectors, what we heard from Oros (phonetic) about process.  We're here, Your Honor. We're having an evidentiary hearing today.  They could have served discovery on us.  They could have sought to take discovery of our experts.  They didn't do so.  The reference with respect to the way this was done in some other cases, it was a reference to Celsius by counsel, where we just tacked some schedule on.  Our view was this process is actually providing due process.  We are not unilaterally deciding what is a complex question, which I'll come to in a moment.

This idea that some delay is fine, it's just fine to have delay.  Well, the debtors don't believe it's fine. We don't believe our creditors.  Maybe Oros thinks it's fine. But we've certainly heard from the creditors' committee and

we've heard from many of our creditors directly.  They want their money back.  And as we've been talking about all day, the debtor's job here is to maximize the value of these estates and to return that value to our creditors.  And we're working hard to do that, and this process is a key part of that effort.

This idea that was raised by the MAPS and OXY holders, well, let's just carve them out.  It's fine.  We can get the relief from everybody else today and we can just carve them out and do something different.  That's precisely the problem, Your Honor.  We need a comprehensive process where we're estimating the value of these assets for all holders.  There are other holders of MAPS and OXY tokens.  We need their claims valued.  There's nothing special about the fact that these holders stepped forward with counsel and said, I don't want to be part of a 503(c) estimation.  I want a claims objection process.

Other people presumably might want that as well. But as we've been talking about all day, it's simply not practical for the purposes we're talking about here, which is to be able to advance these cases through confirmation and through distributions, we need to set the value of the digital assets.  We need to do it in a comprehensive way and in a way that is transparent and that is fair to everybody on an aggregate basis.  And we think we've done that.

Certain of these holders have come forward.  These claimants have come forward and said they needed some additional time for expert discovery.  They intended to bring forward a competing expert on the valuation of these few tokens.  And we understood and said, okay, let's work on a process with the understanding that we have to get to an estimation outcome decided by Your Honor that is consistent with the case timeline and the process we've been talking about.  That schedule was agreed to.

Now, I'm hearing maybe a little bit of backtracking from that this afternoon.  So we will get that schedule in front of Your Honor.  But we've been proceeding on that schedule, and we have been constructively moving that process forward that will get an answer not just for the movants here, but on evaluation of those tokens so that Mr. Moseley and the debtor's team can do the necessary calculations to advance the disclosure statement, to advance, ultimately, confirmation and distributions out to creditors, if and when, we hope, a little later this year, a plan is confirmed.

THE COURT:  Well, let me ask you a question.

MR. GLUCKSTEIN:  Yes.

THE COURT:  You indicated that the debtors are planning on issuing or sending out their disclosure statement in February.  Correct?  But I'm not going to have hearings on

these other estimation motions until March.  How is that going to affect the process here?

MR. GLUCKSTEIN:  What we have said, Your Honor, is that we will file an updated plan and disclosure statement. Our case timeline contemplates that we will have a decision from Your Honor on these issues before we begin the solicitation process.  And we ask Your Honor to enter the solicitation order, so effectively prior to our disclosure statement hearing, so that at the time -- and our solicitation motion expressly contemplates using these values.

So at the time Your Honor is asked to approve our disclosure statement for solicitation, we anticipate having the carved out issues that have been put off here today decided by Your Honor.  That's consistent with the overall schedule that we've been working through with the committee and others.

THE COURT:  Okay.  Got you.  Thank you.

MR. GLUCKSTEIN:  The other argument we heard, which I want to address, is we heard from these objectors that, well, maybe our claims are different because we purported to write down an amount of the value of that claims.  And it's a very simple calculation.  We looked at a pricing source and we wrote it down.

And that is the heart of the issue.  The assets

that we're talking about, Your Honor, are not simply black and white valuations. We heard today from Mr. Lu, the process that he went through to come up with petition day pricing. We heard the process that Dr. Howell went through to look at not only the third party market pricing, but what are the facts and circumstances of this case to value these claims.

This is not a situation where just because an amount was written down that that liquidates the claim. And we knew that this issue could arise. And we wrote in our bar date notice, we made very clear that because of this issue, parties should come forward with their quantities of digital assets and that we would be seeking relief from Your Honor to actually estimate -- to actually set the value of those claims, and that we considered any number that somebody wrote down to be an estimate, because by definition it is. There is no answer. And this goes back to the cases that we cite.

The question is, is this readily ascertainable? Is this easy to calculate? And so, yes, once you have the conversion rate, it is correct that it is a simple mathematical calculation to take the number of tokens you have and multiply it by the conversion rate. The question is, what is the conversion rate? And our submission here, and has been for many months, is that there is not a liquidated claim on these digital assets until this Court

fixes one.  And that's what we're here today to do.

And so we believe that all of the creditors should be subject to this process.  Yes, there's going to be a secondary hearing.  That's in recognition of certain of the arguments that those creditors have stepped forward and said they want to make.  We recognize that some more time was appropriate for that discovery and expert process, primarily because they would bring forward to bring forward a competing expert, we need to take discovery of their expert and everything as well.

But it's all within the framework of 502(c), and we submit that the evidence before Your Honor, between Mr. Moseley and our experts with respect to process, establishes not only that estimation is necessary and appropriate here, which brings us in the rubric of 502(c), that the methodology and the process that we have put before the Court the evidence that's undisputed for purposes of today's hearing, there's been no competing evidence presented, is fair and reasonable to the creditor body as a whole, and we would ask Your Honor to overrule the remaining objections and enter the order.

We do have, as alluded to by counsel, one of the counsels who just stood up for Layer Zero, a slightly revised further form of order based on a few tweaks to some of these reservation rights paragraphs that we've continued to discuss

over the course of today with the hearing.  So in the event that Your Honor were to approve the motion, we would submit a slightly updated version of the order, but the substance of it is unchanged.

THE COURT:  Okay, thank you.

MR. GLUCKSTEIN:  Thank you.

THE COURT:  All right, let me take a recess here. I'll come back and give you my decision.  Let's recess until 3:30 and come back.  Thank you.

(Off the record at 2:43 p.m.)

(On the record at 3:32 p.m.)

THE BAILIFF:  All rise.

THE COURT:  Thank you, everyone.  Please be seated.  All right.  It has been recognized that neither the code nor the Federal Rules of Bankruptcy Procedure provide any procedures or guidance for estimation and bankruptcy court -- and a bankruptcy court has a wide discretion in accomplishing that estimation, in re Chemtura Corp. 448 BR 635 at 648, Bankruptcy, Southern District of New York, 2011.

In estimating a claim, the Bankruptcy Court should use whatever method is best suited to the circumstances.  In re Bittner versus Bourne Chemical Company, Inc. 691 F.2d. 134 at 135, Third Circuit, 1982.

It is conceivable that in rare and unusual cases, arbitration or even a jury trial on all or some of the issues

may be necessary to obtain a reasonably accurate evaluation of the claims.  This is in re Bittner.  Such methods, however, usually will run counter to the efficient administration of the bankruptcy's estate, and where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value -- determine in this case that there is sufficient basis for me to determine the value.

Courts may employ a wide variety of means, including a summary trial, a full blown evidentiary hearing, or a review of pleadings and briefs, followed by oral argument of counsel.  In re AMR Corp., Case No. 11-15463 SLH 2021, Westlaw 295-4824 at 4 Bankruptcy, Southern District of New York, 2021, and have specifically recognized that it is often inappropriate to hold time consuming proceedings which would defeat the very purpose of Section 11 -- excuse me, of Section 502(c)(a) to avoid undue delay.

Thus, a truncated process under Section 502(c) has been found to be consistent with the dictates of due process of law.  Debtors here seek to estimate the two million claims arising from certain digital assets, including specifically digital tokens.  There were a number of objections, many by pro se litigants.  I've already ruled on the objection based on debtors use of the petition date and overruled that objection because the code specifically provides that I have

to value them as of the petition date in U.S. dollars.

The debtor presented the testimony of three witnesses, including two experts, who provided a reasonable basis for the estimation of the claims as of the petition date.  That testimony was unrebutted, and I conclude that the testimony was credible and presented a fair and reasonable basis for the determination of the estimated value of the digital assets.

Several objectors argued that estimation was unnecessary under 502(c) because the value of the claims could be determined through the claim allowance process without undue delay.  I disagree.

The assets at issue are unique.  An evaluation and conversion to U.S. dollars using an allowance process would take an inordinate amount of time in a case where the fees and costs already exceed $300 million.  This is evidenced by the three objectors asking for a claims allowance process. Each asserts that they need discovery, and each asserts that they intend to call their own experts at a future hearing to estimate their individual claims.  Undercuts their argument that it's a quick process.

One objector claimed that their claim is not contingent or unliquidated.  Again, I disagree.  The fact that we have to have experts come in to give me a valuation shows that it is not a liquidated claim.  It's not a

contingent claim, but it's an unliquidated claim.

One objector asserted that the estimation process violates their due process rights because they didn't have sufficient time to review and object to the debtor's motion. That party, however, did not seek a continuance, and as previously noted, courts, including the Third Circuit, have found that the truncated process provided for in the code does, in fact, comport with due process.

Other objectors, including Mr. Lusk, who argued before me today, said that estimation will determine the question of who owns the digital assets, and it's his contention that he owns them. The debtors, however, revised the form of order reserving that issue for a later date. And nothing I do today will affect the rights of the claimants to contest ownership or the debtor's right to contest or the debtor's right to contest that ownership issue.

Based on the evidence presented and the arguments provided in the papers and at the hearing, I find that estimation is appropriate, and the debtor's methodology for estimating the claims is fair and reasonable, and all objections to the motion are overruled. Are there any questions? Anything further from the debtors for today?

MR. GLUCKSTEIN: No, Your Honor. Thank you very much. We will submit the further updated form of order to chambers, and I think that is it for today.

THE COURT:  Okay.  Thank you.

MR. GLUCKSTEIN:  Thank you.

THE COURT:  We are.

(End of Proceedings.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                        February 1, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                        February 1, 2024

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable


/s/ Coleen Rand                               February 1, 2024

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable